**In re ARTHUR ANDERSEN LLP, Relator**

No. 14–03–00572–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 23, 2003.

Rusty Hardin, Andrew Lee Ramzel, Derek Shane Hollingsworth, Houston, for relator.

G. Sean Jez, George, M. Fleming, Houston, for respondents.

Panel consists of Justices FOWLER, EDELMAN, and SEYMORE.

## OPINION

WANDA McKEE FOWLER, Justice.

### I. INTRODUCTION

This case relates to the financial demise of Enron Corporation. In August of 1999,

Ken Lay, President and CEO of Enron Corporation, visited the City of Brenham, Texas in Washington County. The purpose of his visit was to speak to the Washington County Chamber of Commerce at its annual dinner and tout Enron as a savvy investment. This visit was widely publicized in and around Brenham, both by the newspapers and radio. The Plaintiffs,[1] all potential investors in Enron, either attended the meeting and heard Lay tell what a great investment Enron would be for them individually, for their trusts, and for their employee pension plans, or heard about the meeting later. Plaintiffs claim Lay's statements to the group were backed up by Enron's quarterly and annual reports, which indicated that Enron was rock-solid and highly profitable. After investing, the Plaintiffs alleged they would review press releases touting Enron's financial strength and its expected increases in profits.

Lay had told the Plaintiffs and others that they would make lots of money if they invested in Enron. They did make lots of money—for awhile. Then, their stock dropped precipitously. In late 2001, Enron filed for bankruptcy—at the time, the largest ever. Many of Enron's top executives and some officers were accused of illegal activities. Daily news reports indicated that the Justice Department was investigating various Enron officials and investigating the accuracy of Enron's financial reports. Ultimately, several Enron officials were indicted.

The Plaintiffs felt they had been betrayed. They sued Ken Lay and two other Enron executives, unknown before, but by then well known because of the Enron debacle—Andrew Fastow and Jeffrey Skilling—and Arthur Andersen and five of its partners.

Andersen claimed it was just misled just like the Plaintiffs. It tried to join other defendants, namely financial institutions, it claimed were at least partly, if not totally, responsible for Enron's demise. These financial institutions, it claimed, enabled Enron to engage in inappropriate financial deals that masked its economic troubles; without these institutions the Plaintiffs' suit could not be litigated fairly.

But the Plaintiffs claimed that the financial institutions were irrelevant to the lawsuit. They claimed the suit was based on (1) Ken Lay's misrepresentations made that August evening in Brenham, (2) Enron's quarterly and annual financial reports prepared by Andersen, and (3) press releases and other public announcements Enron made concerning its financial strength. They claimed the financial institutions did not misrepresent anything to them the day Ken Lay visited and that their causes of action and petition did not implicate the financial institutions.

The trial court agreed with the Plaintiffs and in April 2003, denied Anderson leave to join the third parties. In July 2003, the trial court also entered a scheduling order that denied joinder of third parties.

In this mandamus, Andersen asks us to hold that the financial institutions are potentially responsible third parties who must be joined, and to set aside the two orders denying joinder. Finally, Andersen asks us to hold that it has no adequate remedy by appeal. Because we agree on all three issues, we conditionally grant the writ of mandamus as to the April 2003 order denying leave to join third parties and the July 2003 scheduling order.

## II. BACKGROUND

We turn first to the historical facts.

---

1. Although the Plaintiffs are the "real parties in interest" in this mandamus proceeding, we will refer to them as "the Plaintiffs" for consistency.

The Plaintiffs sued Andersen[2] and the other defendants[3] for negligent misrepresentation, fraud, and conspiracy. The allegations are extensive and complex, and later we will discuss the relevant allegations in more detail. However, in essence, the Plaintiffs allege that the defendants provided false and misleading public information regarding Enron's financial condition, prompting the Plaintiffs to buy and/or retain existing shares of Enron stock; consequently, their retirement funds were diminished when Enron's true financial condition was eventually revealed and its stock devalued. In particular, the Plaintiffs complain that the defendants failed to disclose Enron's use of "special purpose entities," which concealed Enron's debt and caused its earnings to be overstated.

The procedural history of the suit is complicated; therefore, we will review only those events important to this appeal. In January of 2002, the Plaintiffs filed their original petition. Several months later, Andersen filed its original answer, and a

month after that the Plaintiffs filed a first amended petition adding new plaintiffs. Then, in December of 2002,[4] the Plaintiffs filed a second amended petition again adding new plaintiffs and adding significant factual allegations.

Shortly after the Plaintiffs filed the second amended petition, Andersen filed a motion for leave to join Michael Kopper,[5] J.P. Morgan Chase,[6] CSFB,[7] CIBC,[8] Bank of America,[9] Barclays,[10] Lehman Brothers,[11] and Merrill Lynch,[12] claiming that the Plaintiffs' new factual allegations and public disclosures implicated these third parties in the transactions involving the special purpose entities.

Shortly after this, in early 2003, Andersen answered the claims of the new Plaintiffs in the first and second amended petitions—referring to them as "intervening Plaintiffs." On the same day, Andersen filed its third-party petition.[13]

A month later, the trial court *sua sponte* severed into a separate suit[14] the claims of

2. Cause No. 32,716; *Bullock, et al. v. Arthur Andersen LLP, et al.;* in the 21st Judicial District of Washington County, Texas.

3. The Andersen individual defendants are D. Stephen Goddard, Jr., David B. Duncan, Debra A. Cash, Roger Willard, and Thomas H. Bauer; the Enron individual defendants are Andrew S. Fastow, Kenneth L. Lay, and Jeffrey J. Skilling.

4. Between the original petition and this second amended petition, the case was removed twice and then remanded to the state court.

5. Michael Kopper was an assistant to Fastow.

6. J.P. Morgan Chase includes J.P. Morgan Chase & Co., J.P. Morgan Securities, Inc., J.P. Morgan Chase Bank, and Chase Securities, Inc.

7. CSFB includes Credit Suisse First Boston, Credit Suisse First Boston (USA), Inc., Credit Suisse First Boston Corp., and Donaldson, Lufkin & Jenrette Securities Corporation.

8. CIBC includes Canadian Imperial Bank of Commerce, CIBC Inc., and CIBC World Markets Corp.

9. Bank of America includes Bank of America Corp., Bank of America, N.A., and Banc of America Securities LLC.

10. Barclays includes Barclays PLC and Barclays Bank PLC.

11. Lehman Brothers includes Lehman Brothers Holding, Inc. and Lehman Brothers, Inc.

12. Merrill Lynch's full name is Merrill Lynch, Pierce, Fenner & Smith Incorporated a/k/a Merrill Lynch & Co.

13. The petition also contained a cross-claim against Fastow.

14. The severed suit is entitled *Choucroun, et al. v. Arthur Andersen LLP, et al.* The third parties subsequently removed it to federal

the new Plaintiffs in the second amended petition and Andersen's third-party petition. In response to the severance, the Plaintiffs filed a third amended petition to reflect the Plaintiffs left after the severance order; the third amended petition contained essentially all the greatly expanded factual allegations first raised in the second amended petition.

The trial court held a hearing on Andersen's motion for leave to join third parties. On April 29, 2003, the court signed an order denying the motion. In mid-May of 2003, Andersen filed this mandamus petition and an emergency motion to stay the underlying suit.

Meanwhile, the trial court had set trial for September 29, 2003. However, discovery had previously been stayed until April 24, 2003 by a federal court order.[15] Therefore, despite the pending mandamus petition, the parties began discovery to prepare for the September trial. On July 1, 2003, the Plaintiffs filed a motion to extend the discovery period and a motion for entry of a Level 3 discovery control plan. At a July 8, 2003 hearing on these motions, Andersen again attempted to join third parties by requesting that any such discovery control plan include a deadline for joining additional parties. On July 15, 2003, the trial court entered a scheduling order resetting the trial to November 10, 2003, and setting various deadlines, but the court refused to set a deadline for adding third parties. In August of 2003, we stayed the trial and discovery to allow us to consider the mandamus petition.

court, and it was then transferred to the Judicial Panel for Multidistrict Litigation.

15. The Plaintiffs' law firm represents stockholders in numerous other suits based on substantially the same facts and claims. Several such suits are pending before the Honorable Melinda Harmon of the United States

## III. MANDAMUS STANDARD OF REVIEW

▮ Mandamus relief is available if the trial court clearly abuses its discretion, either in resolving factual issues or determining legal principles, and there is no other adequate remedy at law. *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992). A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.* at 839. However, as to legal issues, an error amounting to an abuse of discretion can be as simple as misinterpreting or misapplying the law. *See Triantaphyllis v. Gamble*, 93 S.W.3d 398, 402 (Tex.App.—Houston [14th Dist.] 2002, pet. denied)(citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985)). Thus, to show abuse of discretion in determining legal principles, the relator must show the trial court failed to analyze or apply the law correctly. *See id; Walker*, 827 S.W.2d at 840. A trial court has no "discretion" in determining what the law is or applying the law to the facts. *Walker*, 827 S.W.2d at 840. Finally, the relator must also show it has no other adequate remedy at law. *Id.*

## IV. THE ISSUES PRESENTED

Andersen contends that the trial court abused its discretion by denying Andersen the right to join the third parties, and that it has no adequate remedy at law. It claims this abuse of discretion is embodied in two orders:

District Court for the Southern District of Texas, including a securities class action entitled *Mark Newby, et al. v. Enron Corporation, et al.* Judge Harmon stayed discovery in the underlying suit from May 1, 2002 until April 24, 2003, while she ruled on motions to dismiss filed by the third parties in *Newby*.

☐ the April 2003 order denying leave to join third parties;[16] and

☐ the July 2003 scheduling order denying joinder of additional parties.[17]

The Plaintiffs claim these orders were proper because the third parties are not responsible parties, and, even if they are responsible parties, the judge had the discretion to refuse to join them because it would delay the trial.

These essentially are the issues before us. To resolve them, we must review the case law on third parties as well as the allegations in the third amended petition and the third-party petition. Then, even if we decide the financial institutions are responsible third parties, as the Plaintiffs claim, we still must determine whether the trial judge abused his discretion in refusing to add them. If we conclude there was an abuse of discretion, we must consider the last hurdle raised by the Plaintiffs— that Andersen has an adequate remedy at law.

## A. DENIAL OF LEAVE TO JOIN THIRD PARTIES

Andersen contends that the trial court abused its discretion by denying leave because the third parties are "responsible third parties" under Chapter 33 of the Texas Civil Practice Remedies Code, and, thus, Andersen has the right to have the entire case, including issues of proportionate responsibility and contribution, tried at one time. The Plaintiffs respond that the third parties are not "responsible third parties" under Chapter 33, but even if they are, the trial court had complete discretion to deny joinder.

### 1. The Definition of "Responsible Third Party"

Chapter 33[18] grants defendants the ability to join "responsible third parties" to a suit.[19] Section 33.004 provides, "on timely motion made for that purpose, a defendant may seek to join a responsible third-party who has not been sued by the claimant." TEX. CIV. PRAC. & REM. CODE ANN. § 33.004 (Vernon 1997). If a "responsible third party" is joined under section 33.004, the trier of fact determines the percentage of responsibility for each claimant, each defendant, each settling person, and each responsible third party. TEX. CIV. PRAC. & REM. CODE ANN. § 33.003 (Vernon 1997). A "responsible third party" is defined as any person to whom all of the following apply:

(i) the court in which the action was filed could exercise jurisdiction over the person;

(ii) the person could have been, but was not, sued by the claimant; and

**16.** Andersen also attacks the February 14, 2003 severance order, but we need not address that order in light of our holding concerning the April 29, 2003 and July 15, 2003 orders.

**17.** Although this order was entered after Andersen filed the mandamus, Andersen filed a supplement to its mandamus petition, claiming that the trial court abused its discretion in its entry of this order. Because it directly impacts Anderson's ability to join third parties, we have considered it.

**18.** Several sections of Chapter 33 cited in this opinion were recently amended. *See* An Act Relating to Reform of Certain Procedures and Remedies in Civil Actions, 78th Leg., R.S., ch. 204, art. 4, §§ 4.01, 4.02, 4.03, 4.04, 4.05, 2003 Tex. Sess. Law Serv. (Vernon) (to be codified as amendments to TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.002, 33.003, 33.004, 33.011). However, the amendments apply only to suits filed on or after July 1, 2003, and, therefore, do not apply to this suit. *See id.* § 23.02(c).

**19.** With limited exceptions not applicable here, Chapter 33 applies to all tort actions. *See* Tex. Civ. Prac. & Rem.Code Ann. § 33.002 (Vernon Supp.2003).

(iii) the person is or may be liable to the plaintiff for all or a part of the damages claimed against the named defendant or defendants.

TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(6)(A) (Vernon 1997).

Here, the third parties satisfy part (i) of the definition because the trial court could exercise jurisdiction over them. They have apparently generally appeared in the severed suit and removed it to federal court. The parties seem to recognize this and focus on parts (ii) and (iii) of the definition. Because parts (ii) and (iii) overlap somewhat, we will address them together. We are required to review the allegations regarding the third parties' role to determine whether they satisfy parts (ii) and (iii). *See Hernandez v. Houston Lighting & Power Co.,* 795 S.W.2d 775, 776 (Tex.App.—Houston [14th Dist.] 1990, no writ) (considering defendant's pleadings to determine whether third party was a proper defendant); *Ryland Group, Inc. v. White,* 723 S.W.2d 160, 162 (Tex.App.—Houston [1st Dist.] 1986, orig. proceeding) (citing plaintiffs' pleadings and defendants' claim that third parties also liable to conclude joinder was required); *Geophysical Data Processing Center, Inc. v. Cruz,* 576 S.W.2d 666, 667 (Tex.Civ.App.—Beaumont 1978, no writ) (stating the propriety of joining parties in any legal proceeding is dependent primarily, although not always exclusively, upon the state of the relevant pleadings).

## 2. How the Pleadings Implicate the Third Parties

The allegations regarding the third parties center on their role in the Enron transactions that involved special purpose entities.[20] The Plaintiffs allege that the Enron defendants, particularly Fastow, used the special purpose entities to achieve "off-balance sheet" treatment, and, thereby, conceal Enron's debt and artificially inflate its earnings.[21] The Plaintiffs further allege that the use of special purpose entities in these circumstances was improper under generally accepted accounting principles; therefore, Andersen should have consolidated the transactions onto Enron's balance sheets. According to the Plaintiffs, the eventual consolidation of the transactions onto Enron's balance sheets contributed to its financial collapse and the devaluation of the Plaintiffs' stock. The pleadings implicate the third parties in the transactions as follows:

☐ *Chewco/JEDI (Michael Kopper and Barclays)*

The Plaintiffs allege that Enron entered into a partnership called JEDI; Fastow then formed a special purpose entity called Chewco to buy an outside investor's interest in JEDI. The Plaintiffs allege that Kopper was directly involved in and benefitted financially from the Chewco/JEDI

20. We make no conclusions regarding the truth of these allegations or whether the third parties will ultimately be found liable. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.002(f) (providing that nothing in this section regarding the applicability of Chapter 33 requires submission to the jury of a question regarding conduct by any party absent sufficient evidence to support the submission). Instead, we consider whether the allegations, if true, show that they may be liable. *See Ryland,* 723 S.W.2d at 162 (concluding joinder required based on plaintiffs' and defendants' claims although whether plaintiffs' theory of recovery will be submitted to the jury can only be determined after the evidence is closed).

21. A criminal complaint has been filed against Fastow in the United States District Court for the Southern District of Texas in connection with the Enron transactions charging, among other offenses, securities fraud, money laundering, and conspiracy to commit fraud.

transactions, and Fastow used Kopper to control the transactions.[22] The Plaintiffs further allege that Barclays loaned $191.5 million (guaranteed by Enron) to Chewco to purchase the outside investor's interest in JEDI and then continued to fund Chewco by the millions. According to the Plaintiffs, the transactions were conducted so that the loans would be inaccurately reflected as outside equity investments.[23]

### ☐ *Mahonia Prepay Transactions (J.P. Morgan Chase)*

The Plaintiffs allege that the Enron defendants "in concert with" J.P. Morgan Chase misrepresented billions in loans as legitimate "prepays" from customers. According to the Plaintiffs, Enron's financial statements improperly characterized the loans as energy trading activity with a special purpose entity called "Mahonia" created by J.P. Morgan Chase.[24]

### ☐ *CSFB's Prepay Transactions*

In its mandamus petition, Andersen asserts that CSFB was engaged in the type of prepay transactions the Plaintiffs allege were fraudulent. The Plaintiffs do not specifically mention CSFB in connection with prepay transactions. However, Andersen alleges in its third-party petition that CSFB was involved in negotiating, structuring, reviewing, financing and/or implementing transactions involving special purpose entities, and profited from the transactions. Also, Andersen presented evidence of CSFB's involvement in prepay transactions.[25]

### ☐ *Nigerian Barges (Merrill Lynch)*

The Plaintiffs allege that the Enron defendants pressured Merrill Lynch to purchase three Nigerian power generation barges. However, the Enron defendants guaranteed Merrill Lynch it would not lose money and would "be taken out of the deal" within a few months, and Merrill Lynch received an up-front fee of $250,000 plus 15% per annum for the period that it held this investment; as guaranteed, the Enron executives subsequently told Kopper to have another special purpose entity buy Merrill Lynch's interest. The Plain-

---

**22.** The Plaintiffs also discuss transactions involving special purpose entities called "RADR ZWS, L.L.C." and "RADR ZWS MM, L.L.C.," which were allegedly concealed from stockholders. Although Andersen does not specifically outline the RADR transactions in its mandamus petition, the Plaintiffs implicate Kopper in these transactions.

**23.** In addition, Andersen presented a newspaper report that according to congressional testimony, the Barclays' loans were structured to hide them from Enron's auditors, and their subsequent discovery played a central role in the Enron financial collapse.

**24.** Andersen included in this record testimony before the United States Senate of Robert Roach, the senate investigator on "The Role of the Financial Institutions in Enron's Collapse." Mr. Roach reported that the financial institutions involved (including J.P. Morgan Chase) funded the prepays, participated in the required trades, and allowed Enron to use offshore entities that they controlled as sham trading partners "for the explicit purpose of allowing Enron to disguise multi-million-dollar loans as trading activity." He further testified these financial institutions understood Enron's goal was to increase operating cash flow without reporting debt, and designed and implemented the financial structures to help Enron achieve its objective.

**25.** Robert Roach testified that to help Enron characterize prepay funds as coming from energy trades, several financial institutions (including CSFB) were careful not to include requirements or descriptive language in the prepay documentation that would disclose the true nature of the transaction. In particular, CSFB instructed its lawyers, "very important for them [Enron] is that the docs are as standard as possible and DO NOT include any representations on accounting driven transactions." Roach concluded that the prepays intentionally made it impossible for investors, analysts, and other financial institutions to uncover Enron's true indebtedness.

tiffs allege that this fraudulent "sale" of assets enabled Enron to falsely record $12 million in earnings.[26]

☐ *LJM Partnerships (Kopper, CSFB, J.P. Morgan, Merrill Lynch, Bank of America, Lehman Brothers, and CIBC)*

The Plaintiffs allege that special purpose entities called LJM Cayman, L.P. and LJM2 Co–Investment, L.P., run by Fastow, were integral to the scheme to manipulate Enron's financial results.[27] Enron allegedly engaged in twenty-four transactions involving the LJM partnerships, including complex hedging transactions worth billions, which were adverse to Enron's interests. According to the Plaintiffs, the LJM transactions enabled the defendants to move poorly performing assets off-balance sheet, manufacture earnings, and improperly inflate the value of investments by back-dating documents. In addition, Fastow allegedly had a secret agreement that ensured the LJM partnerships would not lose money in their dealings with Enron. The Plaintiffs further allege the LJM transactions were tainted by a conflict between Fastow's fiduciary duties to the LJM partnerships and his fiduciary

duties to Enron, and an LJM2 offering memorandum to investors expressly acknowledged this conflict of interest but represented that it would benefit Fastow and the investors. According to the Plaintiffs, Fastow and the other LJM investors profited by the millions through the LJM transactions. Kopper and CSFB are the only potential third parties that the Plaintiffs mention as LJM investors or partners.[28] However, in its motion for leave and third-party petition, Andersen pleads that J.P. Morgan, Merrill Lynch, Bank of America, Lehman Brothers, CIBC, and/or their executives, were also LJM investors or partners.[29]

### 3. With These Allegations, the Plaintiffs Could Have Sued the Third Parties and the Third Parties May Be Liable to Them.

■ In spite of these broad, sweeping allegations, the Plaintiffs still claim this suit is not about the financial institutions. They still claim this suit is about Ken Lay's visit to Brenham and the representations he made there,[30] which enticed the Plaintiffs to invest initially, plus the representations Lay, Andersen and the other

---

**26.** Andersen presented a *Wall Street Journal* article reporting that Merrill Lynch agreed to pay $80 million to resolve SEC charges that it aided Enron in fraudulently overstating its earnings through the Nigerian barge project; Senate investigations revealed that Merrill Lynch "temporarily" purchased the barges from Enron and questioned whether the sale was truly a loan; and a senator characterized some of the financial institutions as "parties to Enron's financial deceptions."

**27.** The criminal complaint against Fastow also cites his alleged involvement in the LJM transactions.

**28.** The Plaintiffs note that Kopper pleaded guilty to criminal conspiracy to commit wire fraud and money laundering with respect to the Enron transactions and agreed to pay proceeds to the government.

**29.** In its mandamus petition, Andersen asserts that CIBC was also involved in off-balance sheet transactions called "Hawaii" and "Braveheart." However, the Plaintiffs do not detail any "Hawaii" or "Braveheart" transactions. Instead, Andersen relies mostly on evidence that is not a part of the mandamus record to explain these transactions. Regardless, we may conclude CIBC is a "responsible third party" based on its alleged involvement in the LJM transactions.

**30.** The Plaintiffs stress that they received Enron's financial reports in Washington County, and Lay represented in his speech "just what a great investment Enron was and how much he expected the stock price to increase."

primary defendants made through press releases and financial reports to entice the Plaintiffs to continue holding their Enron stock. For this reason, they say, the suit is not about the financial institutions, but about the conduct in Washington County, and so, they could not have sued the third parties and the third parties could not be liable to the Plaintiffs. For several reasons, we think they are wrong.

First, based on these pleadings, we do not agree that these suits are not in any way about the financial institutions. We would not go so far as to say that they are *all* about the financial institutions, but, certainly, the financial institutions play a pivotal role in the stories the Plaintiffs will tell the jury. The Plaintiffs seem to be saying that they will have the jurors put on blinders so that they can see only the alleged bad acts of Lay, Andersen, and a few others. But, as the brief history of this debacle shows and these pleadings allege, the fall of Enron is not about one person, or even a few people; it is the story of a host of actors. On these pleadings, asking the jury, or us, to look only at Lay, Fastow, Skilling, Andersen, and some of its partners, is like asking someone to look only at the eye of the hurricane and to ignore the furor surrounding it. Neither is an accurate picture.

■■ Second, for the third parties to be liable for fraud, they need not have made representations directly to the Plaintiffs. Texas case law has held that each party to a fraudulent scheme is responsible for the acts of the other participants done in furtherance of the scheme and liable for fraud. *See Skrepnek v. Shearson Lehman Bros., Inc.,* 889 S.W.2d 578, 580 (Tex. App.—Houston [14th Dist.] 1994, no writ); *Corpus Christi Teachers Credit Union v. Hernandez,* 814 S.W.2d 195, 202 (Tex. App.—San Antonio 1991, no writ). Further, a party who benefits from a fraudulent transaction may be a principal in the fraud and liable as such. *First State Bank of Miami v. Fatheree,* 847 S.W.2d 391, 396 (Tex.App.—Amarillo 1993, writ denied) (citing *Corpus Christi Teachers,* 814 S.W.2d at 202). In fact, a party has been liable for the fraudulent misrepresentations of a third party by mere silent acquiescence when he benefitted from the fraud. *See Bransom v. Standard Hardware, Inc.,* 874 S.W.2d 919, 924 (Tex.App.—Fort Worth 1994, writ denied); *Corpus Christi Teachers,* 814 S.W.2d at 202. Therefore, although the third parties may not have misrepresented anything to the Plaintiffs, they may be liable for fraud because they allegedly participated in the fraudulent transactions and reaped the benefits.[31]

■ Third, the Plaintiffs also argue that the third parties cannot be liable for conspiracy to commit fraud without being liable for the underlying fraud because conspiracy is a derivative tort. *See Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex. 1996) (defining the derivative tort of civil conspiracy as a combination of two or more persons to accomplish an unlawful

---

**31.** The Plaintiffs argue that their "factual background allegations make reference to the third parties" only to emphasize the types of transactions the defendants failed to disclose; they claim they do not show that the third parties may be liable to the Plaintiffs. We disagree. The discussion regarding the third parties is more than simply background material. If proved, the transactions, by their nature, were a means to conceal Enron's true financial condition. The Plaintiffs use the words "fraud" and "conspired" in some instances when describing the third parties' roles. In fact, in her order staying discovery in this and other shareholder cases, Judge Harmon rejected the Plaintiffs' attempts to "repeatedly characterize their cases as grounded in representations" made by Lay at the Washington County meeting because the discovery requested by the Plaintiffs "reveals that the case may begin with a meeting in Brenham, but certainly does not end there."

purpose, or to accomplish a lawful purpose by unlawful means). Plaintiffs are mistaken. A party may be liable for conspiracy to commit fraud without being liable for the underlying fraud. A defendant's liability for conspiracy depends on "participation in some underlying tort for which the plaintiff seeks to hold *at least one of the named defendants liable.*" *See id.* (emphasis added). Civil conspiracy "came to be used to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts." *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 46, at 293 (1971)). Once a conspiracy is proven, each co-conspirator is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination. *See id.* (citing *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W.2d 550, 559 (1937)). Therefore, the third parties may be liable to the Plaintiffs for conspiracy to commit fraud because the Plaintiffs seek to hold at least one of the defendants liable for fraud.[32]

In sum, Andersen has shown that the third-party defendants are implicated in the Plaintiffs' pleadings to such an extent that the Plaintiffs could have sued each third party, and that each third party "may" be liable to the Plaintiffs for all or a part of the "damages claimed" against Andersen and the other defendants. Thus, Andersen has met its burden to show that the third parties are "responsible third parties" under Chapter 33.[33] We now turn to the penultimate issue: whether the trial court abused its discretion.

## B. ABUSE OF DISCRETION

---

32. The Plaintiffs also maintain that an actionable conspiracy requires a "meeting of the minds"; thus, Andersen's claim that the third parties may be liable for conspiracy is inconsistent with its claim that it was ignorant of the transactions and was misled. However, Andersen can deny liability for conspiracy but allege, in the alternative, that the third parties are also liable for conspiracy. *See* TEX. R. CIV. P. 48 (allowing alternative defenses). Nevertheless, the third parties may be liable for conspiring with the Enron executives.

33. In its mandamus petition, Andersen also seeks to join the third parties as "contribution defendants." There is a distinction between a "contribution defendant" and a "responsible third party." A "contribution defendant" means "any defendant, counter-defendant, or third-party defendant from whom any party seeks contribution with respect to any portion of damages for which that party may be liable, *but from whom the claimant seeks no relief at the time of submission.*" TEX. CIV. PRAC. & REM. CODE ANN. § 33.016(a) (Vernon 1997) (emphasis added). The jury determines the percentage of responsibility of a "contribution defendant" separately for purposes of contribution to the defendants, and not as part of the global apportionment of responsibility. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.016(c) (Vernon 1997). On the other hand, the trier of fact determines the percentage of responsibility of a "responsible third party" as part of the global apportionment of responsibility. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003. Andersen continually refers to its desire to have one jury apportion percentages of responsibility "among" all potentially responsible parties. Therefore, we interpret the mandamus petition as primarily seeking leave to join the third parties as "responsible third parties," and secondarily as "contribution defendants." The requirements for joinder of a "contribution defendant" are less stringent than the requirements for joinder of a "responsible third party." *Compare* TEX. CIV. PRAC. & REM. CODE ANN. § 33.016(b) (Vernon 1997) (providing defendant may assert the right to contribution "against any such person as a contribution defendant in the claimant's action") *with* TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(6)(A) (prescribing three-part definition of "responsible third party"). Consequently, the following reasons for allowing Andersen to join the third parties as "responsible third parties" apply if Andersen, alternatively, seeks to join them as "contribution defendants."

Andersen contends the trial court abused its discretion by denying leave to join these "responsible third parties" because it denied Andersen the right to have one jury apportion liability among all potentially responsible parties. The Plaintiffs contend that, even if the third-party defendants are potentially responsible third parties, the trial court acted within its broad discretion in denying joinder. They claim joinder is a bad choice because it will delay the trial, because Andersen waited almost a year after Plaintiffs filed suit to file the third-party action and has waived its right to join third parties, and because adding them will increase costs, confuse the jury, and prejudice the Plaintiffs.[34]

 The Plaintiffs are correct that a trial court ordinarily has great discretion regarding joinder of third parties. *See* TEX. R. CIV. P. 38; TEX. CIV. PRAC. & REM. CODE ANN. § 33.004 (requiring timely motion to join responsible third parties); *Valley Indus., Inc. v. Martin,* 733 S.W.2d 720, 721 (Tex.App.—Dallas 1987, orig. proceeding); *Threeway Constructors, Inc. v. Aten,* 659 S.W.2d 700, 701 (Tex. App.—El Paso 1983, no writ). However, mandamus relief is appropriate if the trial court abuses that discretion. *See, e.g., Jones v. Ray,* 886 S.W.2d 817, 822–23 (Tex. App.—Houston [1st Dist.] 1994, orig. proceeding) (granting mandamus relief because severance of the plaintiffs' claims against some defendants from claims against other defendants would prohibit jury from apportioning appropriate percentage of responsibility for each defendants' conduct); *see also Ryland,* 723 S.W.2d at 163 (granting mandamus relief because severance of defendants' third-

party claims violated the defendants' right to have the liability of all original and third-party defendants determined in the primary suit under then version of Chapter 33).

 As to joinder of third parties, "[o]ne leading commentator in Texas procedural law states, '[l]eave should be liberally granted.'" *See* David F. Johnson, *Paying For The Sins of Another—Parental Liability in Texas for the Torts of Children,* 8 TEX. WESLEYAN L. REV. 359, 377 (2002) (quoting ROY W. MC-DONALD, TEXAS CIVIL PRACTICE § 5:75 (1992)). Joinder rests on the concept of judicial efficiency and the policy of providing full and adequate relief to the parties. *See id.* (citing *OKC Corp. v. UPG Inc.,* 798 S.W.2d 291, 293 (Tex.App.—Dallas 1984, no writ)). A court's decision on joinder should be based on practical considerations with a view to what is fair and orderly. *See id.* at 378 (citing *Fireman's Fund Ins. Co. v. McDaniel,* 327 S.W.2d 358, 373 (Tex.Civ.App.—Beaumont 1959, no writ)). The court may indeed consider whether joinder will delay the trial. *See id.* (citing *Valley Indus.,* 733 S.W.2d at 721). However, the key is whether a delay is reasonable under the facts and circumstances of the suit, keeping in mind the history of the suit, and not simply that a delay will occur. *See id.* at 377–78; TEX. R. CIV. P. 37 (allowing additional parties to be brought in ... "but not at a time or in a manner to *unreasonably* delay the trial of the case") (emphasis added).

██ Here, the extraordinary facts and circumstances surrounding the Enron collapse dictate joinder and far outweigh any delay the joinder may cause.[35] As we have

---

34. Although the Plaintiffs argue joinder will delay the trial, after they filed their response to the mandamus petition, the trial court delayed the trial to enable them to timely designate experts.

35. In her opinion on the third parties' motion to dismiss in *Newby,* Judge Harmon recog-

discussed, the Plaintiffs allege that numerous, complex, fraudulent transactions heavily contributed to the collapse and their resulting damages. The Plaintiffs and Andersen allege the third parties were intimately involved in the transactions, invested millions—and billions in some cases—and benefitted financially from them. Most significantly, the Plaintiffs and Andersen allege the third parties were involved in concealing the transactions from stockholders such as the Plaintiffs.[36] Yet, Andersen has been denied the opportunity to have the jury in this suit determine whether the third parties may also be liable to the Plaintiffs. Based on judicial efficiency and the policy of providing full and adequate relief to the parties, Andersen has the right to have the entire case tried at one time and have one jury apportion liability among all responsible parties.

The Plaintiffs urge several other reasons that the trial court acted within its discretion by denying leave. For instance, they assert that Andersen did not seek to join the third parties until nearly a year after the Plaintiffs filed suit. However, due to the enormity and complexity of the Enron collapse, we reject the suggestion that Andersen should have known the extent of the third parties' involvement sufficiently to join them only two months after the Enron collapse.[37] Instead, knowledge of the third parties' alleged role unfolded over time.[38] Most significantly, the Plaintiffs first implicated the third parties in their second amended petition; Andersen moved for leave to join them three days later. Consequently, we find no delay in seeking joinder that justifies the trial court's denying leave.

Next, the Plaintiffs argue that joining the third parties will multiply the costs of litigation and discovery. However, the Plaintiffs, not Andersen, interjected these transactions into the suit. Moreover, even if the financial institutions are not joined, the pleadings and allegations concerning the financial institutions will force the parties to obtain discovery from the third parties.[39] In particular, Andersen notes it needs discovery from the third parties to show the transactions were appropriate and properly recorded, or that critical information was not disclosed to Andersen. The discovery to be conducted is potentially massive regardless of the joinder.

nized that the rapid collapse of Enron and the resulting scope, variety, and severity of losses are unprecedented in American corporate history. See Newby, 235 F.Supp.2d 549, 565 (S.D.Tex.2003).

36. Andersen also presented evidence that some of the transactions may have been intentionally concealed from it. Lynn Turner, former SEC chief accountant, reported to the United States Senate that Andersen gave some good guidance regarding treatment of the prepay transactions, and it appeared "like some people almost attempted to mislead Andersen, which is highly unfortunate."

37. According to the Plaintiffs, Enron unraveled and its stock plummeted in October and November 2001. Enron filed bankruptcy on December 2, 2001. The Plaintiffs filed suit on January 24, 2002.

38. The Senate reports regarding the role of the third parties were not issued until July 2002. Kopper did not plead guilty to criminal charges until August 2002. The criminal complaint against Fastow was not filed until October 2002. The first settlement by a financial institution (Merrill Lynch) with the SEC regarding the transactions at issue occurred in February 2003.

39. The Plaintiffs have stated that they do not necessarily need discovery from the third parties. However, in ordering the stay of discovery, Judge Harmon stated the Plaintiffs had undertaken a "massive amount of discovery" including subpoenas requesting all records pertaining to numerous LJM partnerships.

The Plaintiffs further argue that joining the third parties will confuse the jury. Again, the Plaintiffs interjected the extensive and complex facts regarding the transactions into the suit. Therefore, even without joinder, the Plaintiffs will presumably introduce the transactions to the jury because they are at the heart of the Plaintiffs' claims. Again, Andersen will also presumably rely on the transactions to defend itself. Therefore, we reject the argument that any potential jury confusion justifies the denial of joinder.

Finally, the Plaintiffs generally assert they will be prejudiced by the joinder. To the contrary, for the reasons we have discussed, Andersen could be unfairly prejudiced if denied the right to join the third parties.

In sum, because we conclude that the decision to deny leave to join third parties amounted to a clear and prejudicial error of law, the trial court abused its discretion.

## C. NO ADEQUATE REMEDY AT LAW

■ Having found an abuse of discretion, we consider whether Andersen has an adequate remedy at law. Andersen asserts it does not because it may be foreclosed in the future from obtaining contribution from the third parties. We say "may be foreclosed" because the law on this issue is not settled. In *Casa Ford,*

*Inc. v. Ford Motor Co.,* 951 S.W.2d 865, 877 (Tex.App.—Texarkana 1997, pet. denied), the court held that Chapter 33 does not permit a tortfeasor subject to a judgment to bring a post-judgment contribution claim against a tortfeasor who was not a party to the primary suit. However, the Plaintiffs assert that the Texas Supreme Court suggested the opposite in dicta in *Ingersoll–Rand Co. v. Valero Energy Corp.,* 997 S.W.2d 203, 208 (Tex.1999). There, the court addressed contractual indemnity—not contribution for a tort judgment. *See id.* Nevertheless, the court stated "[i]n a suit for either contribution or indemnity the injury upon which suit might be based does not arise until some liability is established. In this case, *as in a contribution claim against a joint tortfeasor,* liability could not have been established until judgment was rendered." *See id.* (emphasis added). Because this issue is not settled, Andersen must gamble on how a court considering a later contribution action might rule on the issue. Therefore, we cannot state with certainty that Andersen will have an adequate remedy in a separate suit against the third parties.[40]

Even if Andersen could prosecute a separate suit against the third parties, it is the opportunity to have *one* jury apportion liability among all responsible third parties that Andersen seeks.[41]

---

**40.** We question whether *Ingersoll-Rand* is even contrary to *Casa Ford.* The court may have meant that a claim for contribution against a joint tortfeasor, *whose percentage of responsibility was already determined in the primary suit,* does not accrue until judgment is rendered. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.015 (Vernon Supp.2003). Further, we note that despite its dicta in *Ingersoll-Rand,* the court previously denied review of *Casa Ford.* In addition, after *Ingersoll-Rand,* another court relied on *Casa Ford,* albeit in an unpublished case, and the Supreme Court denied review. *See BDO Seidman, LLP v. Bracewell & Patterson, LLP,* No. 05–02–

00636–CV, 2003 WL 124829, at *2 (Tex. App.—Dallas, January 16, 2003, pet.denied). For these reasons, we cannot rely on *Ingersoll-Rand* to rule that Andersen could bring a separate suit for contribution against the third parties if they are not joined here.

**41.** The Plaintiffs also assert that Andersen can obtain contribution from the third parties in *Newby.* However, any such right would not rectify the lack of opportunity to have one jury apportion liability among all responsible parties in *this* suit.

Relator has a substantial right to present the complete set of intertwined facts and issues germane to his claims, to *one* factfinder, in *one* proceeding, rather than in two separate suits that are all but foreordained to generate, collectively, a decision destined to fail in the appellate process. The denial of that right would introduce the "empty chair defense," and thereby skew the progress and entire conduct of the proceedings-with the resultant potential to affect the outcome of the litigation profoundly, and to compromise the presentation of the parties' respective claims or defenses in ways unlikely to be apparent in the appellate record.

*Jones,* 886 S.W.2d at 822 (citations omitted).

Similarly, due to the third parties' alleged role in the Enron collapse, their absence would likely profoundly affect the conduct and outcome of this suit in ways unlikely to be apparent in the appellate record. Moreover, due to the enormity of the facts surrounding the collapse, any separate action against the third parties, or even a successful appeal in this suit, would result in an enormous waste of resources. The additional expense and effort of preparing for and participating in two separate trials does not, standing alone, justify mandamus relief. *See id.* at 822 n. 9 (citing *Walker v. Packer,* 827 S.W.2d at 842). However, when a trial court's error will cause a waste of judicial resources, we may properly consider that factor in determining the adequacy of an appeal. *See id.* Therefore, the potential waste of resources, when combined with the possibility that Andersen may not be able to prosecute a separate suit against the third parties, or successfully appeal in this suit, supports our conclusion that Andersen has no adequate remedy at law.

## V. CONCLUSION

Having found that the trial court abused its discretion in denying Andersen leave to join the third parties, and Andersen has no adequate remedy at law, mandamus relief is appropriate. Accordingly, we sustain Andersen's second issue. Because we sustain Andersen's second issue, we need not consider its first issue challenging the February 14, 2003 severance order. We also sustain in part Andersen's supplemental challenge to the July 15, 2003 scheduling order and hold that it is vacated to the extent it conflicts with our ruling that Andersen be allowed to join the third parties.

We are confident the trial court will (1) vacate its April 29, 2003 order and enter an order granting Andersen leave to join the third parties addressed in this opinion and (2) amend the July 15, 2003 scheduling order to allow the addition of the new parties and corresponding changes in the pretrial deadlines. Therefore we conditionally issue this writ. If the trial court fails to follow this order, the writ will issue. Having disposed of this original proceeding, we lift the stay imposed by our order of August 7, 2003.