NO. 07-03-0379-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

OCTOBER 6, 2005
_____

DENNIS WATTS, INDIVIDUALLY AND D/B/A SENIOR BENEFIT PLANS
AND D/B/A PROFESSIONAL FINANCIAL SERVICES OF LUBBOCK,  APPELLANT

V.

SUSAN GREEN, APPELLEE

_____

FROM THE 110TH DISTRICT COURT OF FLOYD COUNTY;

NO. 9406; HONORABLE JOHN R. HOLLUMS, JUDGE
_____

Before QUINN, C.J., and CAMPBELL, J. and BOYD, S.J.[1]


**OPINION**


Appellant Dennis Watts appeals a judgment rendered on a jury verdict in favor of appellee Susan Green awarding actual and exemplary damages arising from Green's investment in pay telephones promoted by Watts.  We affirm the judgment in part and reverse in part.

--------

[1] John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

## Factual and Procedural Background

Watts owns and operates a Lubbock insurance business under the name Senior Benefit Plans (SBP), selling health insurance, life insurance and annuities. Watts has "managing general agent" contracts with insurance companies, under which he receives a commission from sales he makes and a percentage "override" on sales made by agents recruited by him and who have contracts "underneath" his contract.

Several agents are associated with SBP. Most rent office space from Watts while a few maintain offices elsewhere. Watts testified the agents are not his employees, but contract directly with insurance companies to offer their products and are paid commissions directly by those companies.

Watts sometimes accompanies agents on sales calls. On some such occasions, agents will request his assistance with a particular client, and will agree to share with him their commission from sales made to that client.

In 1996 Nathan Grimes became one of the agents associated with SBP. Not long after, he sold Susan Green a health insurance policy. In subsequent conversations, he discussed with her the funds she had invested in certificates of deposit, and suggested annuities as an alternative to her CD's. She purchased her first annuity from Grimes in the summer of 1997. She eventually placed all of her savings in investments through Grimes.

In the fall of 1999 Watts was introduced to a man named Nino Cimini who represented a marketing company later called TSI Group, Inc. Watts arranged a meeting

at SBP offices at which Cimini presented a program TSI was promoting. That program involved the sale of pay telephones by TSI, acting through agents such as Watts and Grimes, to investors who were offered the option of operating the telephones personally or leasing them to a management company who would operate the telephones and make a fixed monthly payment to the lessor. The management company in the TSI program was Phoenix Telecom.

Watts and several agents associated with SBP contracted with TSI to sell its telephones. Several also participated in a second similar program to sell telephones for a company named ATC, Inc. which were then leased to Alpha Telcom.

Among other sales materials, Watts and other SBP agents made use of a flyer to tout the pay telephone investment. The one-page document, introduced as plaintiff's exhibit 6, does not expressly refer to pay telephones but recites several benefits of an unspecified investment.[2] Its heading reads "You Can't Beat It!!!!" Watts testified he did not draft the document but added the text "Offered by Senior Benefit Plans of Lubbock" to a copy of the flyer he received by fax. Watts said he used the flyer as a direct mail advertisement, mailing it to fifty prospective investors in an effort to generate interest. Grimes, and apparently other agents, used the flyer during sales presentations.

---

[2] The flyer attributes to the unidentified investment characteristics including "A great return - 14.1% return on capital; Safety - insured asset backed for safety; Guaranteed - contractually guaranteed for 5 years; No market risk - You won't loose [sic] your gains; No interest fluctuations - level returns for 5 years." Other sales materials made similar claims.

3

In April 2000 Grimes met with Green concerning the telephone investment program, using in his presentation to her the "You Can't Beat It!!!!" flyer as well as other sales materials. Green agreed to liquidate all the other investments she had made through Grimes, incurring a penalty, and purchased eight telephones from TSI, leasing them to Phoenix. She also purchased five telephones from ATC, Inc., leasing them to Alpha Telcom. Her investments totaled $81,000. In June 2000 Phoenix quit making payments. Through discussions with Grimes or correspondence from Phoenix, Green learned Phoenix was in bankruptcy and lessors could have their telephones managed by a company named ETS. Green agreed to assignment of the Phoenix leases to ETS.

Green testified ETS did not make payments in accordance with the lease agreements and soon was in bankruptcy also. Green continued to receive lease payments for the telephones she purchased from ATC but sought to liquidate that investment because she was concerned about the risk. She testified Grimes told her it was a different situation from that involving Phoenix and "everything would be fine." When she maintained her desire to liquidate, Grimes persuaded her to keep the telephones by offering documentation of insurance. He provided a document entitled "Equipment Purchaser's Buy Back Guarantee Certificate."

On one occasion Green called SBP, requesting to speak to Grimes or the person "in charge." She ultimately spoke to Watts, who she had met briefly in 1998 when he accompanied Grimes on a visit to her place of employment. They had a lengthy telephone

4

conversation, and Watts subsequently spoke with her again by telephone. He made efforts on her behalf concerning her ATC phones.[3]

Green was not able to recover the capital she invested or any insurance proceeds and received a total of only $2,749.14 in lease payments. She brought suit against Watts and Grimes asserting claims for negligence, fraud, violation of the Deceptive Trade Practices Act,[4] breach of fiduciary duty and negligent representation. She also alleged Watts was liable for Grimes's conduct under theories of agency, conspiracy and joint enterprise. In response to questions the jury found (1) the negligence of Grimes proximately caused Green's damages, (2) there was a relationship of trust and confidence between Green and Grimes, (3) Grimes breached a fiduciary duty he owed to Green, (4) both Watts and Grimes committed fraud against Green, (5) both made negligent representations to Green on which she justifiably relied, (6) Grimes engaged in deceptive trade practices which caused damages to Green, (7) Grimes engaged in unconscionable action which caused damages to Green, (8) Grimes's deceptive practices or unconscionable conduct was intentional, (9) Watts and Grimes were engaged in a joint enterprise, (10) Watts and Grimes were not engaged in a conspiracy, and (11) Grimes had actual or apparent authority to act as Watts's agent. The jury found Green suffered actual damages in the amount of $25,000, she should be awarded exemplary damages of $27,750 from Watts and $47,250 from Grimes, and her reasonable and necessary

---

[3] Watts testified that, after his conversations with Green, he contacted an official with one of the involved companies and told him "to do one of two things. Number one, to either get her phones insured, or, number two, to refund her money back."

[4] Tex. Bus. & Com. Code Ann. §§ 17.41-.506, .55-.63 (Vernon 2002).

attorney's fees were $30,000. Watts perfected appeal from that judgment. Grimes did not appeal.

Watts challenges the trial court's judgment in five points of error. He challenges the legal and factual sufficiency of the evidence supporting the jury's answers finding: (1) he committed fraud against Green, (2) he made negligent misrepresentations to her, (3) he was engaged in a joint enterprise with Nathan Grimes, (4) Grimes had actual or apparent authority to act as his agent, and (5) that Green was entitled to the award of exemplary damages.

Standard of Review

When both legal and factual sufficiency issues are raised, we review the legal sufficiency point first to determine whether there is any probative evidence to support the jury's verdict. *See Glover v. Texas General Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). In a legal sufficiency review, we review the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001); *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). A legal sufficiency point will be sustained when: (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of a vital fact. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). More than a scintilla, and thus legally sufficient,

6

evidence of the existence of a vital fact is present when the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the fact's existence. *Lee Lewis Const.*, 70 S.W.3d at 782-83.

When considering factual sufficiency challenges to a jury's verdict, courts of appeals must consider and weigh all of the evidence, not just evidence which supports the verdict. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). A court of appeals can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

## Fraud

Watts's first point of error challenges the jury finding he committed fraud against Green. We sustain the point, concluding the evidence is legally insufficient to support the jury's finding.

Green's response to Watts's first point does not identify any representation made by Watts to Green, but seeks to impute to Watts the general conduct of Grimes, alleging Watts was the "architect of the entire plan to sell these fraudulent products." She cites cases including this court's opinion in *First State Bank of Miami v. Fatheree*, 847 S.W.2d 391 (Tex.App.–Amarillo 1993, writ denied), and *Corpus Christi Area Teachers Credit Union v. Hernandez*, 814 S.W.2d 195 (Tex.App.–San Antonio 1991, no writ), for the proposition

7

that each party to a fraudulent transaction is responsible for the acts of the other if done in furtherance of the fraudulent scheme. She also relies on language from *In re Arthur Anderson, L.L.P.,* 121 S.W.3d 471, 481 (Tex.App.–Houston [14th Dist.] 2003, no pet.), stating that a party who participates in a fraudulent transaction and reaps the benefits need not have made representations to a plaintiff to be liable for fraud.

Here the jury was instructed[5] that fraud occurs when a party makes a material misrepresentation; the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion; the misrepresentation is made with the intention that it should be acted on by the other party; and the other party acts in reliance on the misrepresentation and thereby suffers injury.[6] *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). As submitted, the fraud question thus required the jury to find Watts made a material misrepresentation. The question of Watts's liability for the conduct of Grimes was submitted to the jury through the questions asking about joint enterprise, conspiracy and agency.

The evidence reflects no direct communication between Watts and Green concerning her investment in pay phones until after her purchase of them. Both Watts and

---

[5] The record before us does not reflect any objections made to the questions or instructions contained in the court's charge. We therefore review the sufficiency of the evidence in light of the charge submitted. *Bradford*, 48 S.W.2d at 754; *see City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000).

[6] The charge followed the pattern jury charges for factual misrepresentations and false statements of opinion. *See* Comm. on Pattern Jury Charges, State Bar of Texas, Texas Pattern Jury Charges–Business, Consumer, Insurance & Employment, PJC 105.3A, 105.3D, 105.3E (2003).

8

Green testified to telephone conversations concerning the bankruptcy of ETS and her desire to liquidate her telephone investments. The dates of the conversations were not clearly established but Green said the first conversation was "very shortly" after Phoenix entered bankruptcy proceedings one-and-a-half months after she made her investment.

Assuming that the conversations contained misrepresentations that otherwise could provide a basis for liability, there is no evidence that Green took any action to her injury in reliance on any misrepresentation Watts made in the conversations. Her investments were already made, and the question before her at the time was whether to agree to Phoenix's assignment of her lease to ETS.

We similarly conclude the "You Can't Beat It!!!!" flyer cannot form the basis for Watts's liability on a fraud theory. Even assuming, *arguendo*, the statements in the flyer could be seen as representations by Watts to Green that satisfy the other elements of fraud,[7] there is no evidence Green acted in reliance on the flyer. As Watts's brief notes, on its face, the flyer does not refer to the pay phones and or any other particular investment. Only by receiving additional information, which Green indisputably received through Grimes's sales presentation, could a reader of the flyer learn of the particular opportunity it touted.

We agree with Watts the evidence is legally insufficient to support the jury's finding he committed fraud, and sustain his first point of error.

---

[7] Grimes acknowledged in his testimony that at least one statement in the flyer was untrue at the time of his presentation to Green. Watts acknowledged that statements in the flyer could be misconstrued.

Exemplary Damages

Our disposition of Watts's first point of error requires also that we sustain his fifth point, in which he challenges the legal and factual sufficiency of the evidence supporting the award of exemplary damages to Green. The exemplary damages question inquired of the jury what sum, if any, should be assessed against the defendants as exemplary damages "for the conduct found in response to Question 3 [concerning the defendants' compliance with a fiduciary duty] or 4 [concerning fraud]." In their responses to questions 3 and 4, the jury found that Grimes did not comply with his fiduciary duty to Green[8] and found that both Watts and Grimes committed fraud against her.

As applicable to this case, Section 41.003 of the Civil Practice & Remedies Code in effect at the time Green brought suit permitted an award of exemplary damages when a claimant proves by clear and convincing evidence that the harm with respect to which exemplary damages are sought resulted from fraud. Acts of June 16, 1987, 70th Leg., 1st C.S., Ch. 2, § 2.12, 1987 Tex. Gen Laws 37 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon 1997 & Supp. 2004)). Having found no evidence that fraud committed by Watts caused harm to Green, we must conclude the award of exemplary damages is not supported by legally sufficient evidence.

Green contends that evidence supporting Watts's vicarious liability for Grimes's actions also will support the imposition of exemplary damages on Watts. We do not agree.

---

[8] In response to a previous question, the jury effectively determined Watts did not owe Green the duties of a fiduciary.

10

The question submitted conditioned the award of exemplary damages on the jury's findings on the fiduciary duty and fraud questions. The jury was not instructed that it could award such damages based on its findings of joint enterprise or agency. *Cf. Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 393-94 (Tex. 1997). Watts's fifth point of error is sustained.

## Joint Enterprise

We next consider Watts's third point, which challenges the legal and factual sufficiency of the evidence supporting the jury's finding that he and Grimes were engaged in a joint enterprise. There is no dispute that evidentiary support for that finding would justify imposition of liability on Watts for Grimes's conduct.[9] *See Shoemaker v. Estate of Whistler*, 513 S.W.2d 10, 13 (Tex. 1974). In *St. Joseph Hospital v. Wolff*, 94 S.W.3d 513 (Tex. 2002), the supreme court reaffirmed its adoption of the Restatement (Second) of Torts' recitation of the elements which must be established to find a joint enterprise. *Id.* at 526 (quoting *Shoemaker*). The jury was instructed accordingly, that a joint enterprise exists if the persons concerned have (1) an agreement, express or implied, with respect to the enterprise or endeavor; (2) a common purpose; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *See id.*; Restatement (Second) of Torts, § 491 (1965).

---

[9] The jury's findings that Grimes's actions were the cause of injury to Green are not challenged in this appeal.

11

Watts contends, without discussion or citation of authority, there is no evidence of any of the first three elements. We disagree. Grimes testified Watts called him and other agents associated with SBP together when TSI's Cimini came to present the pay phone investment product. Watts and Grimes each signed contracts providing for their sale of the product. The product was discussed subsequently at SBP's weekly sales meetings. The flyer Watts distributed, seeking to generate interest in the investment program, stated it was "offered by Senior Benefit Plans of Lubbock." Watts sometimes conducted joint sales presentations to clients, with Grimes and other agents. Like in the insurance business, Watts shared in the agent's commission when they made a joint sale. When Green called SBP, Watts discussed her investment with her rather than simply referring her to Grimes. He personally took action with a phone marketing company official on her behalf. The jury had ample evidence from which it could infer at least an implied agreement between Watts and Grimes concerning sale of pay phones and a common purpose to do so.

Neither party specifically addresses the third element, which was the focus of the court's opinion in *St. Joseph Hospital*. In explicating the meaning of the term "community of pecuniary interest" in the common purpose, the court wrote "[t]here must . . . be evidence that the monetary benefits were shared among the members without special or distinguishing characteristics[.]" 94 S.W.3d at 532 (adopting language from *Ely v. General Motors Corp.*, 927 S.W.2d 774, 779 (Tex.App.–Texarkana 1996, writ denied)). Testimony indicated that agents' contracts providing for their sale of pay phones contained a commission structure similar to that of their insurance agency contracts. Agents such as Grimes received a ten percent commission on their own sales. Watts received a six

12

percent "override" on sales by other agents, and a sixteen percent commission on his own sales. The percentages Watts and Grimes each received differed, but the monetary benefits Watts received from a sale by Grimes otherwise was not distinguishable from that received by Grimes. The jury heard evidence from which it could find the third element of a joint enterprise.

Watts's argument focuses on the fourth element of joint enterprise. The Restatement language adopted by the supreme court and included in the court's charge requires proof of "an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Shoemaker*, 513 S.W.2d at 16; *see Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 614 (Tex. 2000). The supreme court has said that the equal right to control element means that each participant in the joint enterprise must have "an authoritative voice" or "some voice and right to be heard." *Able*, 35 S.W.3d at 614, quoting *Shoemaker*, 513 S.W.2d at 16.

Viewed in a light tending to support the finding of joint enterprise, the record contains evidence that Watts had a voice and right to be heard concerning the sale of pay telephones by Grimes. Grimes and Watts operated out of Watts's business premises under Watts's assumed name of Senior Benefit Plans. After TSI questioned Watts's use of the flyer, Watts told Grimes and other agents to stop using it as a mail-out piece. Although Watts did not meet with Green concerning her investment in the phones, he sometimes conducted joint sales presentations to clients with Grimes. Watts's two telephone conversations with Green after her purchase of the phones, and his efforts on her behalf with the phone company marketing official also speak to his right to be heard

13

concerning the subject of Grimes's dealings with Green.  Legally sufficient evidence supports the existence of the fourth element of joint enterprise.

Evidence contrary to the jury's finding included the testimony of Watts and Grimes that Grimes was self-employed and Watts did not control Grimes's activities in the sale of pay phones.  Watts generally had no prior knowledge of who Grimes planned to solicit or of the nature of his conversations with prospective purchasers.  Grimes's contract with the sellers of phones like TSI was separate from Watts's contract.  Grimes testified that TSI's temporary termination of Watts's contract in a dispute over the use of the "You Can't Beat It!!!!" flyer did not affect his contract.  Considering all the evidence, however, and applying the meaning given the equal right to control element by the supreme court, we cannot say the jury's finding that Watts had an equal right to a voice in the direction of Grimes's sale of pay phones is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust.[10]

## Conclusion

Our disposition of Watts's first, third and fifth points of error disposes of his appeal, making consideration of his second and fourth points unnecessary.  Tex. R. App. P. 47.1.

---

[10] *Watts v. Lawson*, No. 07-03-0485-CV, 2005 WL 1241122 (Tex.App.–Amarillo May 25, 2005, no pet.), involved claims against Watts and Grimes brought by another of Grimes's clients who purchased pay telephones from him.  Our conclusion here is consistent with the holding in that case that similar evidence supported a finding Watts and Grimes were engaged in a joint enterprise.

14

The trial court's judgment awarding exemplary damages against Watts is reversed; otherwise, the judgment is affirmed.


James T. Campbell
Justice