COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-03-341-CV

 

 

JAMES M. COTTEN                                                           APPELLANTS

AND WEATHERFORD

BANCSHARES,
INC.                                                                             

 

                                                   V.

 

WEATHERFORD BANCSHARES,                                              APPELLEES

INC., JOE E. SHARP, AND
ZAN

SHARP STATHAM AND

JAMES
M. COTTEN                                                                             

 

                                              ------------

 

              FROM THE 43RD DISTRICT COURT OF PARKER COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








Appellant James M. Cotten filed this declaratory
judgment suit against (1) Appellee Weatherford Bancshares, Inc. (WBI), a bank
holding company, to enforce statutory inspection rights and for wrongful
redemption of Cotten=s preferred stock and (2) Joe E.
Sharp and Zan Sharp Statham individually for fraud, breach of fiduciary duty,
oppression, and civil conspiracy regarding the wrongful redemption.  After the trial court granted Sharp and
Statham=s no-
evidence motion for partial summary judgment and Sharp, Statham, and WBI=s
motions for directed verdict, the jury found WBI liable on the only remaining
claim for rigging the redemption drawing. 
The trial court entered a final judgment reflecting the jury
verdict.  Both Cotten and WBI
appeal.  We affirm in part, modify in
part, and reverse and remand in part the trial court=s
judgment as to WBI.  We affirm in part
and reverse and remand in part the trial court=s
judgment as to Sharp and Statham.

Background Facts








Since the early 1900s, Cotten=s family
has held an ownership interest in First National Bank of Weatherford (the
Bank).  In the late 1970s, the Bank
created WBI, a holding corporation, to allow it to add bank branches.  WBI then bought all the shares of the Bank,
and, in exchange for their ownership interest, gave the shareholders preferred
shares in WBI.  Ultimately, a
multiple-tier holding corporation scheme was developed.  Parker County Bancshares, Inc. became the
top-tier parent holding company, owning 100% of First Parker Bancshares, Inc.,
which in turn owned 99.84% of WBI, which in turn owned 100% of First
Weatherford Bancshares, Inc., which in turn owned 99.3% of the Bank.  Cotten and his family also held common stock
in Parker County Bancshares.  Each
holding company=s sole asset is the stock of the
subsidiary directly below it.

In December 1993, Sharp purchased a majority of
the common shares in Parker County Bancshares. 
Sharp=s controlling interest in Parker
County Bancshares automatically gave him the controlling interest in First
Parker Bancshares, WBI, and the Bank. 
After Sharp obtained a majority of the shares in Parker County
Bancshares, he sought complete ownership of the company.  Cotten and his family, however, refused to
sell their shares to Sharp.  Sharp then
planned an involuntary merger that would require Cotten and his family to sell
their shares in Parker County Bancshares to a new company Sharp had created.  After suit was filed for an appraisal of the
fair price of the stock, Sharp acquired all of the Parker County Bancshares=s stock,
including that of Cotten and Cotten=s
family, giving him total control of Parker County Bancshares.  At the time of that suit, however, Cotten and
his family still held preferred shares of stock in WBI, which were not affected
by the suit.








Following Sharp=s
takeover, Cotten began questioning him about non-payment of WBI dividends owed
to Cotten as a preferred shareholder. 
Then, in January 1996, Sharp and his daughter Statham, who together
comprised the entire WBI board of directors, sent a letter to Cotten and his
family informing them that their preferred shares had been redeemed.  Cotten objected to the redemption because he
claimed it was not conducted as required by WBI=s
articles of incorporation (the Articles). 
Although the redemption was never officially rescinded, Sharp and
Statham did not enforce it.

Cotten later noticed a discrepancy in some of the
Bank=s public
records; they showed a decrease of about $16,000 in the Bank=s
capital stock.  Cotten then requested
inspection of certain corporate books and records as provided by statute.[1]  Some, but not all, of the requested records
were produced for inspection.  In May
1997, when Cotten insisted on inspection of the remaining documents, Sharp and
Statham conducted what they characterized as a random drawing, whereby they
redeemed Cotten=s preferred shares.  Thereafter, they refused inspection in part
on the ground that Cotten was no longer a shareholder.








Cotten then filed suit against WBI to enforce his
right to inspection and to declare the redemption of his shares a sham and a
fraud.  Cotten also sued Sharp and
Statham for fraud, breach of fiduciary duty, oppression, and civil
conspiracy.  In January 2002, after suit
had been filed, Sharp and Statham redeemed all the remaining preferred shares
of WBI pursuant to the provision in the Articles that allowed total redemption
of preferred shares.  On the first day of
trial, the trial court granted Sharp and Statham=s
no-evidence motion for summary judgment on Cotten=s fraud
claim.  At the close of Cotten=s case,
the trial court granted WBI=s motion
for directed verdict on Cotten=s
inspection claim and Sharp and Statham=s motion
for directed verdict on the breach of fiduciary duty, oppression, and civil
conspiracy claims.

The jury was only left with the question of
whether the May 1997 redemption drawing had been Arigged,@ which
Cotten had raised based on the rigging allegation in his live petition.  The jury found that it had, returning a
verdict for Cotten and awarding attorney=s fees
against WBI.  By the parties=
stipulation, the trial court assessed damages. 
The trial court found that although the May 1997 redemption of Cotten=s
preferred shares was void, WBI=s
January 2002 redemption redeemed all preferred shares, including Cotten's, and
thus Cotten was only allowed damages from the date of the void redemption until
January 7, 2002, when WBI redeemed all remaining preferred shares.  The trial court then issued a final judgment
for Cotten, awarding him those restricted damages and attorney=s fees.








In five issues, Cotten argues that the trial
court erred (1) by holding that he did not remain a preferred shareholder of
WBI at all times subsequent to the void redemption drawing of May 1997; (2) by
granting WBI=s motion for directed verdict
(or by so ruling sua sponte) as to his statutory inspection rights by
holding as a matter of law (a) that he was provided access to the requested
records, and (b) that he was not entitled to copies of them; (3) by granting
Sharp and Statham=s no-evidence motion for partial
summary judgment on his fraud claims; (4) by granting Sharp and Statham=s motion
for directed verdict on his breach of fiduciary duty, civil conspiracy, and
oppression claims; and (5) alternatively and only if this cause is remanded for
trial at WBI=s request as to any issue
pertinent to the validity of the May 1997 redemption drawing, that the trial
court erred by holding, as a matter of law, that the Articles allowed
redemption of Ashareholders@ and not
Ashares.@

WBI brings six cross-issues, arguing that (1) the
trial court abused its discretion by admitting the testimony of an undisclosed
witness, Rolanna Fitzgerald; (2) there is no evidence to support the jury=s
finding that the May 1997 redemption drawing was Arigged@; (3)
the trial court erred by finding that Cotten did not fail to mitigate his
damages; (4) the trial court erred by not reducing the damage award by the
amount that Cotten failed to mitigate his damages; and (5) the trial court
erred by (a) awarding attorney=s fees
to Cotten; and (b) failing to award attorney=s fees
to WBI.

Inspection








In his second issue, Cotten argues that the trial
court erred by granting WBI=s motion
for directed verdict, holding that he was provided access to the corporate
records he had requested and that he was not entitled to copies of them.  We agree with Cotten.

A directed verdict is proper only under limited
circumstances:  (1) when the evidence
conclusively establishes the right of the movant to judgment or negates the
right of the opponent or (2) when the evidence is insufficient to raise a
material fact issue.[2]
 In reviewing a directed verdict, we must
credit favorable evidence if reasonable jurors could and disregard contrary
evidence unless reasonable jurors could not.[3]








If the question to be decided is whether the losing party
at trial raised a material fact issue, we consider all the evidence in a light
most favorable to the party against whom the verdict was instructed and
disregard all contrary evidence and inferences; we give the losing party the
benefit of all reasonable inferences created by the evidence.[4]  If we determine that any conflicting evidence
of probative value raises a material fact issue on any theory of recovery, then
the directed verdict is improper because such an issue is for the jury to
resolve.[5]

Article 2.44C of the Texas Business Corporations
Act states:

Any person who shall have been a shareholder for at least six (6)
months immediately preceding his demand, or shall be the holder of at least
five per cent (5%) of all the outstanding shares of a corporation, upon written
demand stating the purpose thereof, shall have the right to examine, in person
or by agent, accountant, or attorney, at any reasonable time or times, for any
proper purpose, its relevant books and records of account, minutes, and share
transfer records, and to make extracts therefrom.[6]

 

Furthermore, shareholders of a corporation are
equitable or beneficial owners of the corporation=s
assets.[7]  Consequently, Cotten, a preferred shareholder
in WBI, is an equitable owner of First Weatherford Bancshares because WBI is
the owner of all the stock in First Weatherford Bancshares. Cotten, therefore,
is also an equitable owner of the Bank because First Weatherford Bancshares is
the owner of 99.3% of the Bank.  Thus,
Cotten has a statutory right to inspect documents of WBI, First Weatherford Bancshares,
and the Bank.








In this case, the record reflects that there are
fact issues regarding whether WBI provided Cotten with the requested
documents.  There was evidence at trial
that Cotten requested, among other things, inspection of any internal and
external audit reports and all compilations, projections, and/or forecasts from
any CPA.  The record also reflects that
Sharp informed Cotten that none of those documents existed.  Cotten, however, produced evidence at trial
that two WBI checks signed by Sharp were written to pay a CPA and one WBI check
signed by Sharp was written to pay for an audit.  The record further reflects that although
Cotten requested WBI audits and CPA reports and WBI paid for the audits and CPA
services, the services were provided for the Bank.  The record shows that Sharp and Statham
understood that Cotten was requesting the Bank audits and CPA reports that WBI
had paid for.








Rolanna Fitzgerald, the administrative assistant
to the Bank president at the time of the request, also testified that the
holding companies had audits.  There is
some evidence that Statham stated that, as a holding company, WBI's function
was to attend all regulatory audits of the holding companies.  Sharp also testified that regulatory audits
were conducted of the holding companies. 
Thus, the record reflects issues of fact regarding whether audits and
CPA reports existed that WBI refused to allow Cotten to inspect.  Consequently, the trial court erred by
finding as a matter of law that Cotten was provided access to the requested
records.

Furthermore, Cotten argues that he was entitled
to copies of the corporate documents. 
WBI contends, however, that Cotten was entitled to extracts of the
records, not copies of them.  Although WBI
contends that the term Aextract@ in the
statute is unambiguous, it failed to provide us any definition of extract.  WBI simply suggests that because article
2.44B of the Texas Business Corporations Act states that a director may Amake
copies or extracts from books or records,@ Cotten
was entitled to extracts, not copies. 
Furthermore, at trial, WBI stated that because the statute allowed
extracts, Cotten was entitled to make a handwritten copy of the documents, not
a photocopy.  We decline to interpret the
statute so narrowly.








Black=s Law
Dictionary defines Aextract@ as A[a]
portion or segment, as of a writing; [t]o draw out or forth; to pull out from a
fixed position.@[8]  It also references Aestreat,@ which
it defines as A[a] copy or duplicate of some
original writing or record.@[9]  Webster=s
Dictionary=s definition of Aextract@
includes Ato select and copy out.@[10]  The plain meaning of extract in the statute,
therefore, includes copies of the records.[11]  Thus, the trial court erred by finding that
as a matter of law, Cotten was not entitled to copies of the records under the
statute.  We sustain Cotten=s second
issue.

Breach of Fiduciary Duty

In his fourth issue, Cotten argues that the trial
court erred by granting Sharp and Statham=s motion
for directed verdict on his breach of fiduciary duty claim.  We disagree with Cotten.








While corporate officers owe fiduciary duties to
the corporation they serve, they do not generally owe fiduciary duties to
individual shareholders unless a contract or confidential relationship exists
between them in addition to the corporate relationship.[12]  Due to its extraordinary nature, the law does
not recognize a fiduciary relationship lightly.[13]  Therefore, whether such a duty exists depends
on the circumstances.[14]








Fiduciary duties may arise from formal and
informal relationships and may be created by contract.[15]  An informal fiduciary duty may arise from a
moral, social, domestic, or purely personal relationship of trust and
confidence, generally called a confidential relationship.[16]  A confidential relationship exists where
influence has been acquired and abused and confidence has been extended and
betrayed.[17]  A person is justified in placing confidence
in the belief that another party will act in his best interest only where he is
accustomed to being guided by the judgment or advice of the other party and
there exists a long association in a business relationship as well as personal
friendship.[18]  Thus, the relationship must exist prior to
and apart from the agreement that is the basis of the suit.[19]  And, although a confidential relationship is
ordinarily a question of fact for the jury, it becomes a question of law when
the trial court refuses to submit issues on fiduciary duty based on no
evidence.[20]

In this case, Cotten presented no evidence of a
confidential relationship with either Sharp or Statham.  The evidence reflects that the only relationship
that Cotten had with Sharp and Statham was restricted solely to corporate
dealings.  Both Cotten and Sharp
testified that neither cared for the other much and that they would each prefer
never to deal with the other.  Cotten
further testified that he did not trust Sharp or Statham.  Consequently, there is no evidence of a
confidential relationship.








Additionally, although majority shareholders are
sometimes said to stand in a fiduciary relationship with both the corporation
that they control and with the minority shareholders, Sharp and Statham do not
own any stock in WBI.[21]  The corporation that they own and control is
the majority shareholder in this case. 
Corporations are separate legal entities,[22]
and Cotten failed to sue the majority shareholder corporation.  Cotten cannot piggyback his claims against
the corporation onto Sharp and Statham.[23]








Cotten argues that Sharp and Statham=s
complete control of all the holding companies makes them fiduciaries.  Fiduciary duties may be owed by those in
control to preferred shareholders.[24]  Those fiduciary duties are found by courts to
be based on the articles of incorporation as a contract.[25]  In this case, the trial court found that the
Articles did not constitute a contract between Sharp, Statham, and Cotten
because there was no privity.  Because
Cotten does not challenge the trial court=s
finding that there was no contract, the finding is binding.  Thus, because the trial court found that the
Articles did not constitute a contract, and the record does not reflect that
there was any other contract between Sharp, Statham, and Cotten, there is no
evidence that Sharp and Statham owed Cotten any contractual fiduciary
duties.  Consequently, after reviewing
the record under the proper standard,[26]
we hold that the trial court did not err by granting Sharp and Statham=s motion
for directed verdict on the breach of fiduciary duty claim.  We overrule this subissue.

Oppression

Also in his fourth issue, Cotten argues that the
trial court erred by granting Sharp and Statham=s motion
for directed verdict on his oppression claim. 
We agree with Cotten.  The trial
court held as a matter of law that there can be no oppression between common
shareholders and preferred shareholders. 
That holding did not defeat Cotten=s
oppression cause of action, however, because he, a minority preferred
shareholder, sued Sharp and Statham as directors of WBI, not as mere
shareholders.

AOppression@ has
been defined by courts as follows:

1.  majority shareholders= conduct that
substantially defeats the minority=s expectations that, objectively viewed, were
both reasonable under the circumstances and central to the minority shareholder=s decision to join the
venture; or

 








2.  burdensome, harsh, or wrongful conduct; a
lack of probity and fair dealing in the company=s affairs to the
prejudice of some members; or a visible departure from the standards of
fair dealing and a violation of fair play on which each shareholder is entitled
to rely.[27]

 

Additionally, Black=s Law
Dictionary defines Aoppression@ as A[u]nfair
treatment of minority shareholders by the directors or those in control of the
corporation.@[28]

Because of the bank holding company structure,
many internal conflicts are created that may lead to oppressive conduct.[29]  One of the conflicts that exists is between
directors and preferred shareholders.[30]  The conflict is especially more apparent in a
case such as this one, involving a corporation with a board of directors with
controlling common stockholdings:[31]








In th[o]se cases, both legitimate financial
interest and virtually unlimited legal power merge in a way that is difficult
to separate . . . .  Far more significant to preferred
stockholders, and far more damaging from a financial perspective, are . . .
conflicts where directors, even when acting in apparent good faith and in the
absence of a particular financial interest in the transaction, can damage the
interest of the preferred by furthering exclusively the interests of the
common.[32]

Furthermore, in discussing internal conflicts as they apply to bank
holding companies, it has been said that,

[In holding companies]
the subsidiary=s directors are subject
to the control of the [parent] holding company, often because they are
high-ranking employees of the [parent] holding company.  In light of the dominant role played by the
shareholder in the subsidiary=s operation, it seems disingenuous to pretend
that the subsidiary=s directors can ever act
truly independently of the wishes of the parent.  The directors will rarely be able to fairly
carry out their duties in the horizontal conflict situation.[33]

 

Because the potential exists for oppressive conduct
between directors and preferred shareholders, we hold that Cotten has a cause
of action as a preferred shareholder against Sharp and Statham as directors of
WBI.  In addition, there is some evidence
to support Cotten=s oppression cause of action.








In this case, there is some evidence that Sharp
and Statham damaged the interest of Cotten, a preferred shareholder, by
furthering exclusively their own interest as common shareholders.  The parties agree that Sharp and Statham
control WBI.  They not only serve as the
board of directors in every holding company, but they are also majority common
shareholders of the top-tier parent holding company.  The trial court=s
findings show that the jury found that Sharp and Statham improperly redeemed
the preferred shares.  Sharp and Statham=s
improper redemption of the preferred shares, creating a financial benefit for
themselves by decreasing the preferred share dividends that had to be paid out
of capital they control, raises a fact issue regarding whether their conduct
fits the second category of oppressionCburdensome,
harsh, or wrongful conduct; a lack of probity and fair dealing in the company=s
affairs to the prejudice of some members; or a visible departure from
the standards of fair dealing and a violation of fair play on which each
shareholder is entitled to rely.[34]

After our review of the record under the proper
standard,[35]
we cannot hold that as a matter of law there can be no oppression between
directors and preferred shareholders. 
Therefore the directed verdict on this claim was improper.  We sustain this subissue.

Civil Conspiracy








Additionally, in his fourth issue, Cotten argues
that the trial court erred by granting Sharp and Statham a directed verdict on
his conspiracy claim based on its holding as a matter of law that there could
be no civil conspiracy because there could be no oppression.  We agree with Cotten.

In Cotten=s third
amended original petition, he contends that Sharp and Statham conspired to
deprive or impair him of his vested property rights and violate the Articles of
WBI and applicable law.  An actionable
civil conspiracy is a combination by two or more persons to accomplish an
unlawful purpose or to accomplish a lawful purpose by unlawful means.[36]  The essential elements are:  (1) two or more persons; (2) an object to be
accomplished; (3) a meeting of the minds on the object or course of action; (4)
one or more unlawful, overt acts; and (5) damages as the proximate result.[37]  A party may be liable for conspiracy to
commit fraud without being liable for the underlying fraud.[38]  A defendant=s
liability for conspiracy depends on Aparticipation
in some underlying tort for which the plaintiff seeks to hold at least one of
the named defendants liable.@[39]








A corporate officer may be held individually
liable for a corporation=s tortious conduct if he
knowingly participates in the conduct or has either actual or constructive
knowledge of the tortious conduct.[40]  Instigating, aiding, or abetting the
wrongdoing constitutes participation.[41]  AIt is
settled law of this state that where a third party knowingly participates in
the breach of a fiduciary, such [a] third party becomes a joint tortfeasor with
the fiduciary and is liable as such.@[42]








In this case, the jury question asked whether WBI
rigged the drawing to redeem Cotten=s
preferred shares, implicitly asking whether WBI committed a fraud.  Although the trial court properly held that
there was no evidence that Sharp and Statham committed fraud, there is evidence
that they participated in WBI=s fraud
against Cotten.  Thus, oppression was not
the only underlying tort for which Sharp and Statham could be liable for civil
conspiracy.[43]  The record reflects that there was some
evidence presented to the jury that Sharp and Statham, and thus WBI, agreed and
planned to redeem Cotten=s preferred stock in violation
of the Articles, and by doing so, deprived him of his preferred stock.  Furthermore, evidence was presented at trial
that Sharp and Statham as corporate officers of WBI knowingly participated in
the fraud by rigging the drawing.  Thus,
issues of material fact existed for the jury on Cotten=s civil
conspiracy claim.  Consequently, the
trial court erred by holding as a matter of law that without oppression there
could not be a civil conspiracy.  We
sustain this subissue.

Fraud

In his third issue, Cotten argues that the trial
court erred by granting Sharp and Statham=s
no-evidence motion for partial summary judgment on his fraud claim.  We disagree with Cotten.








After an adequate time for discovery, the party
without the burden of proof may, without presenting evidence, move for summary
judgment on the ground that there is no evidence to support an essential
element of the nonmovant's claim or defense.[44]  The motion must specifically state the
elements for which there is no evidence.[45]  The trial court must grant the motion unless
the nonmovant produces summary judgment evidence that raises a genuine issue of
material fact.[46]

We review the evidence in the light most
favorable to the party against whom the no-evidence summary judgment was
rendered.[47]  If the nonmovant brings forward more than a
scintilla of probative evidence that raises a genuine issue of material fact,
then a no-evidence summary judgment is not proper.[48]








In this case, Sharp and Statham allege that
Cotten=s fraud
claim was pleaded as a common-law fraud claim, which only includes actual
fraud.  Cotten alleges that both actual
and constructive fraud were pleaded.  At
common law, the term Afraud@ means
an act, omission, or concealment in breach of a legal duty, trust, or
confidence justly imposed, when the breach causes injury to another or the
taking of an undue and unconscientious advantage.[49]  Common-law fraud includes both actual and
constructive fraud.[50]

AActual fraud@ usually
involves dishonesty of purpose or intent to deceive.[51]  The elements of actual fraud are:  (1) a false, material representation was
made, (2) that was either known to be false when made or was made without
knowledge of its truth, (3) that was intended to be acted upon, (4) that was
relied upon, and (5) that caused injury.[52]

Cotten presented no evidence to raise an issue of
fact that he was injured because he actually relied on the misrepresentation of
Sharp and Statham.  In fact, Cotten
concedes that he did not actually rely on any representation made by either
Sharp or Statham because he did not trust them, and he knew they did not follow
the proper procedure to redeem his shares. 
Thus, the trial court did not err to the extent that it held that there
was no evidence of actual fraud. 








Constructive fraud, however, encompasses those
breaches that the law condemns as Afraudulent@ merely
because they tend to deceive others, violate confidences, or cause injury to
public interests, regardless of the actor=s mental
state.[53]  Therefore, constructive fraud is the breach
of a legal or equitable duty that the law declares fraudulent because it
violates a fiduciary relationship.[54]      Because we have already held that Cotten
presented no evidence at trial of a fiduciary relationship between Sharp,
Statham, and himself, he necessarily 
presented no evidence of constructive fraud.  We overrule Cotten=s third
issue.

Void Redemption 

In his first issue, Cotten argues that the trial
court erred by finding that although Cotten remained a preferred shareholder of
WBI following the void May 1997 redemption, his shares were effectively
redeemed in January 2002 when WBI redeemed all remaining preferred shares.  We agree with Cotten.  Statutes, articles, or contract provisions on the redemption or
retirement of stock must be strictly complied with.[55]  Any right of redemption must be exercised in
accordance with the terms of the contract or instrument giving the right.[56]








In this case, the Articles set forth the
following redemption provisions:

The corporation, at the
option of the Board of Directors, may at any time redeem the whole, or from
time to time redeem any part of the preferred shares outstanding by paying in
cash therefor the sum of $104.00 per share, plus all dividends declared but
unpaid thereon as provided in this Article to and including the date of
redemption, hereinafter referred to as the Aredemptive price@, and by giving to each
preferred shareholder of record at his last known address, as shown on the
records of the corporation, at least twenty (20), but not more than fifty (50)
days= prior notice personally
or in writing, by mail, postage prepaid, stating the class or series or part of
the class or series of shares to be redeemed and the date and plan of
redemption, the redemptive price, and the place where the shareholders may
obtain payment of the redemptive price on surrender of their respective share
certificates, hereinafter called Aredemption notice.@ [Emphasis added.]

 

After May 1997, WBI improperly considered Cotten=s
preferred shares redeemed.  Because at
trial the May 1997 redemption was found to be void, Cotten remained a preferred
shareholder.  Cotten was therefore a
shareholder at the time of the January 2002 redemption.  Because of WBI=s
reliance on its improper May 1997 redemption, however, it was undisputed at
trial that Cotten was not sent and he did not receive the proper redemption
notice for the January 2002 redemption. 
Consequently, the January 2002 redemption, as it would apply to Cotten,
did not comply with the Articles.  As a
result, the January 2002 redemption as applied to Cotten is also void.  Cotten therefore remains a preferred
shareholder, and he is entitled to receive dividends until his shares are
properly redeemed.








Because Cotten remains a preferred shareholder,
the trial court erred by finding that his shares were effectively redeemed in
January 2002 and limiting Cotten=s damages
to dividends accrued from May 1997 to January 2002.  We sustain Cotten=s first
issue.  Because of our disposition of WBI=s
cross-issues, we do not reach Cotten=s fifth
issue.[57]

CROSS-ISSUES

Admissibility of
Testimony

In its first cross-issue, WBI argues that the
trial court erred by admitting the testimony of Rolanna Fitzgerald, an
undisclosed witness.  WBI states that
Cotten did not disclose Fitzgerald in his discovery responses, that it timely
objected to the testimony at trial, and that it requested that the trial court
exclude her as a witness on the ground that Cotten failed to disclose her as a
person with knowledge of relevant facts. 
Furthermore, WBI argues that Texas Rules of Civil Procedure Rule
193.6(a) automatically excluded the witness at trial.  We disagree.








The record is devoid of any objection or evidence
that the witness was not disclosed.  The
record reflects only that WBI, during trial, presented an oral motion in limine
to prevent Fitzgerald from testifying about a prior bad act of Sharp that she
had testified to in her deposition taken by WBI.  The trial court granted the motion in limine,
over Cotten=s objection.

Furthermore, WBI admits that Fitzgerald was named
as a person with knowledge of relevant facts; it merely argues that Cotten
failed to supplement his interrogatory responses to state her updated
address.  One of the purposes of Rule
193.6(a) is to prevent trial by ambush.[58]  The record reflects that WBI deposed
Fitzgerald before trial; thus, WBI had prior notice of her testimony and was
not ambushed at trial.  Therefore,
because the record does not reflect an objection or evidence of a failure to
disclose the witness and the record does reflect that the trial court granted
WBI=s only
request regarding the witness=s testimony,
the motion in limine, we hold that the trial court did not abuse its discretion
by admitting Fitzgerald=s testimony.  We overrule WBI=s first
cross-issue.

Legal Sufficiency








In its second cross-issue, WBI argues that there
is no evidence to support the jury=s
finding that the May 1997 drawing was Arigged.@  We disagree. 
A
legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence
of evidence of a vital fact; (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact;
(3) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of a vital
fact.[59]  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could, and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.[60]  Anything more than a scintilla of evidence is
legally sufficient to support the finding.[61]

WBI argues that the only direct evidence of the
manner in which the drawing was conducted is Sharp=s
testimony and that no other direct evidence was presented to contradict his
testimony.  Circumstantial evidence,
however, was presented to contradict Sharp=s
testimony.








In this case, the record reflects that Cotten=s family
had held shares in the Bank since 1902. 
Cotten had served on the board of the Bank and WBI.  When Sharp was looking into purchasing a
majority of the common shares in Parker County Bancshares, the top-tier parent
holding company, Sharp came to Cotten to get access to Bank records.  Cotten declined to help because he thought it
was a Ashady
deal,@ and he
told Sharp that he would have a lawsuit on his hands if he tried to take over
the bank.  Sharp, however, decided to
purchase the shares of stock, which gave him control of a majority of the
shares.  Both Cotten and Sharp testified
that this interaction began the conflict between them.

Incumbent management at the time of the sale
resisted Sharp=s efforts to acquire control,
and a group of shareholders filed suit against Sharp to stop the
acquisition.  Cotten did not join the
suit, but he sympathized with the cause and gave the shareholders $5,000 to
help pay for legal fees.  Sharp thought
the suit was Atotally bogus,@ and
after the unsuccessful suit ended, he decided that he needed to get rid of all
the people who had sued him.

Sharp began purchasing additional common shares
from individuals for $114-$117 per share. 
Sharp offered Cotten $117 per share, but Cotten would not sell because
he thought the stock was worth a lot more than $117.  Because Cotten, Cotten=s
sister, and two other small shareholders refused to voluntarily sell their
stock to Sharp, Sharp adopted a plan of merger that required the shareholders
to sell their common stock for $117.








Cotten refused the merger price and brought suit
to enforce his right under articles 5.11 and 5.12 of the Texas Business
Corporation Act to receive full fair value for his shares.[62]  A court-appointed appraiser determined the
fair value of the stock was $250 per share. 
Settlement was reached in the suit and Sharp paid $280 per share to resolve
all claims.  Although Sharp acquired
Cotten=s Parker
County Bancshares common shares after the merger, Cotten still retained his WBI
preferred shares.

Because the WBI preferred shares were still
outstanding, the preferred shareholders continued to expect Sharp to pay
dividends.  When no dividend was paid at
the end of the first quarter after Sharp acquired control, shareholders began
to question whether dividends were going to be paid.  Cotten, on behalf of himself and other
shareholders, asked Sharp why the dividends had not been paid.  Sharp said that there was not going to be a
dividend because he had the authority to spend the money as he saw fit, and he
was using the money to buy a bank in Munday, Texas.  Sharp viewed Cotten as an agitant, and he
believed that he had to get rid of him and his sister.








Sharp then began to comment on his plans to
redeem preferred shares. Tellers at the bank who held one, two, or three
preferred shares were approached about turning in their shares and getting paid
for them if they would invest in a retirement plan that Statham was
selling.  Sharp and two other men were
present when Cotten was informed that this Aoffer@ had
been made to the tellers.  Cotten stated
that there was no way that those people could turn in their shares and be paid
because the only way those shares could be redeemed was by lot, by drawing out
the shares, or by paying every preferred shareholder off, too.  Agitated at Cotten=s
statement, Sharp Ahuffed off and walked off.@ Sharp
testified that he wanted to get rid of Cotten and his family.  The Cotten family made comments at the Bank=s
shareholders meetings, so Sharp needed to get rid of the problem.

Shortly thereafter, Cotten received a letter from
Sharp and Statham informing him that WBI had Aelected
to redeem@ his WBI preferred shares.
Cotten=s, his
sister=s, and
his nephew=s preferred shares were the only
preferred shares elected for redemption. 
There was not a drawing of preferred shares by lot or pro rata; Sharp
admitted that he just redeemed the Cotten family=s
preferred shares to get rid of them.








Although Cotten had received the letter stating
that his shares had been redeemed, he did not act on the redemption
demand.  Cotten did not believe that the
redemption was valid because Sharp and Statham had not followed the redemption
procedure set out in the Articles. 
Cotten told Sharp that his shares were not redeemed properly because
redemption had to be pro rata or by lot. Although the redemption was never
rescinded, Sharp and Statham did not enforce it.

In March or April 1997, while reviewing public
reports by WBI to the Federal Reserve Bank, Cotten noticed a reduction of about
$16,000 in WBI capital stock.  By letter,
Cotten then requested to review WBI records that would reflect the reason for
the $16,000 reduction.  Cotten was
allowed access to some of the records, and he found that WBI=s
transfer ledger stated Parker County Bancshares=s
preferred shares had been Aredeemed
by WBI per Joe SharpBpaid $15,808.@  Sharp owns the majority common stock in and
serves on the board of Parker County Bancshares.  Although Sharp would not tell Cotten what was
going on at the time he noticed the reduction in capital stock, Sharp testified
that the $15,808 went to Parker County Bancshares and then went to First Baird
Bancshares, Inc., which Sharp=s family
also controls. 








In 1997, the corporate structure was also
changed.  First Baird Bancshares became
the top-tier parent holding company, owning 100% of First Baird Bancshares of
Delaware, Inc., which in turn owned 97.3 % of First National Bank of Baird and
94.76% of WBI, which in turn owned 100% of First Weatherford Bancshares, Inc.,
which in turn owned 99.3% of the Bank and 80.75% of First Munday Bancshares,
Inc., which in turn owned 100% of First Munday Bancshares of Delaware, Inc.,
which in turn owned 100% of First National Bank of Munday.  Each holding company was controlled by Sharp
and each company=s sole assets were the stock of
the subsidiary directly below it. Thus, the only time any of the holding
companies had cash was when dividends were paid.  Consequently, the Bank=s cash
is the only cash all the holding companies rely on.

After reviewing the records in April and early
May 1997, Cotten requested copies of certain documents.  A few days later, Cotten sent a letter to
Sharp following up on the request for the copies.  Sharp responded in a letter stating that he
would not allow copies of the documents.








Three days later, on May 15, 1997, Sharp and
Statham secretly conducted what they characterized as a random drawing of the
seventy-nine preferred shareholders for redemption of the shareholder=s
shares.  Cotten=s name
was one of only seven names drawn by Sharp and Statham at this secret
drawing.  Cotten=s 874
shares represented two-thirds of the shares redeemed.  Cotten was then sent a letter that said that
Sharp and Statham had decided to conduct the first random drawing ever held by
WBI to redeem Aup to 1,200 but not more than
1,500 shares of the Corporation=s
preferred stock,@ and that his preferred shares
had been redeemed.

Prior to this drawing, no notice had been given
of Sharp and Statham=s redemption plan, nor were
there any corporate board meeting minutes prior to or after the drawing
reflecting Sharp and Statham=s
redemption plan.  Because it was widely
known that Cotten and Sharp had animosity toward each other and that on many
occasions Sharp had stated that he wanted Cotten out of the picture, Rolanna
Fitzgerald testified that Ait was
very coincidental that Mr. Cotten=s stock
was drawn out of all the shareholders.@

Additionally, Sharp stated that Cotten=s
inspection requests added to the 
motivation for getting rid of him. 
Following the redemption of Cotten=s
preferred shares, Sharp refused Cotten any access to corporate records, in part
because he was no longer a shareholder of WBI.








These facts show more than a scintilla of
evidence that the drawing was rigged. 
Because the jury had the advantage of not only hearing the testimony,
but also seeing the witnesses and all the surrounding circumstances that play a
part of the process of determining credibility, we defer to the jury on
credibility of the witnesses.[63]  Furthermore, in fraud claims, such as the
rigged drawing in this case, motive, past conduct, and related wrongful acts
are factors considered because fraud is usually not discernible by direct
evidence and is usually so covert or attendant with such attempts at
concealment as to be incapable of proof other than by circumstantial evidence.[64]  Even if comments about getting rid of Cotten
were made Ain jest,@ as WBI,
Sharp, and Statham argue, they could be properly considered as circumstantial
evidence.  Consequently, the evidence is
legally sufficient to support the jury=s
finding that the May 1997 drawing was Arigged.@  We overrule WBI=s second
cross-issue.

Mitigation








WBI also argues in its third and fourth
cross-issues that the trial court erred by finding that Cotten did not fail to
mitigate his damages and by not reducing the damage award by the amount that
Cotten failed to mitigate his damages. 
Cotten argues that these issues have been waived.  We agree.      A
party asserting an affirmative defense, such as mitigation, in a trial before
the court must request findings in support thereof to avoid waiver.[65]  If the findings filed by the trial court do
not include any element of the defense asserted, then the party=s
failure to make a timely request for additional findings relevant thereto is a
waiver of the right to complain on appeal of the court=s lack
of such findings.[66]

The mitigation of damages doctrine requires the
injured party to exercise reasonable care to minimize its damages if damages
can be avoided with only slight expense and reasonable effort.[67]  The party asserting failure to mitigate has
the burden of proving facts showing lack of such mitigation and must also show
the amount by which the damages were increased by failure to mitigate.[68]   In this case, WBI submitted proposed findings
of fact and conclusions of law one month before the trial court filed its
findings of fact and conclusions of law. 
In its proposed findings of fact, WBI requested the court to find:








4.     At
the time of the 1997 redemption, WBI deposited the price for the redeemed
shares ($92,370.26) into a bank account for Plaintiff=s benefit.

 

5.     The $92,370.26 deposited by WBI for Plaintiff
from the 1997 redemption was always available to Plaintiff.

 

6.     Plaintiff did not withdraw, and did not
attempt to withdraw, any portion of the $92,370.26 deposited for Plaintiff from
the 1997 redemption.

 

The trial court signed findings of fact on November 23, 2003 that, in
the most relevant portion, stated:

9.     At the time of the 1997 redemption, [WBI]
deposited $92,370.26 into a bank account for Plaintiff=s benefit.

 

. . .
. 

 

11.  Plaintiff did not withdraw the $92,370.26 with
respect to his 874 preferred shares nor surrendered his stock certificates.

 

The trial court=s findings of fact and
conclusions of law do not include any 
element of mitigation.  Following
the trial court=s filing of its findings of fact
and conclusions of law, WBI did not object or request additional findings.  Consequently, WBI has waived its third and
fourth cross-issues, and we overrule them.

 

 

 








Attorney=s Fees

Finally, in WBI=s fifth
and sixth cross-issues, it alleges that the trial court erred by awarding
attorney=s fees
to Cotten and failing to award attorney=s fees
to WBI.  We disagree with WBI.

In a declaratory judgment proceeding, the trial Acourt
may award . . . reasonable and necessary attorney=s fees
as are equitable and just.@[69]  The grant or denial of attorney=s fees
in a declaratory judgment action lies within the discretion of the trial court,
and its judgment will not be reversed on appeal absent a clear showing that it
abused its discretion.[70]  A trial court abuses its discretion when it
acts without reference to any guiding rules or principles or rules without
supporting evidence.[71]













In this case, WBI only challenges whether the
fees were equitable and just.  We find no
evidence in the record to indicate that the trial court=s
attorney=s fees
award was inequitable or unjust, and there is some evidence to support it.  At trial, Cotten prevailed on his illegal
redemption declaratory judgment claim. 
The testimony at trial shows that Cotten accrued $64,125 in attorney=s fees,
75% of which were attributable to the redemption declaratory judgment
claim.  Additionally, the record shows
that $2,425.99 in trial expenses accrued. 
The jury awarded Cotten $75,000 for reasonable and necessary attorney=s
fees.  In its final judgment the trial
court reduced the attorney=s fees
award to $50,519.74 for preparation and trial. 
This amount appears to be $48,093.75, which is 75% of the $64,125 total
attorney=s fees
accrued and attributable to the redemption declaratory judgment claim, plus
$2,425.99 for trial expenses.  Such a
calculation was appropriate.  When a
party seeks to recover attorney=s fees
in a case involving multiple claims, one of which he prevailed on and others of
which he did not, the party must offer evidence segregating attorney=s fees
among the various claims.[72]  An exception to this duty to segregate arises
when the attorney=s fees are in connection with
claims arising out of the same transaction and are so interrelated that their
prosecution entails proof of essentially the same facts.[73]  Whether fees can be segregated between
various claims is a question for the court.[74]  Here, Cotten=s
counsel himself testified that he was able to segregate the percentage of time
allocated to the different causes of action. 
He did not argue that the claims were so interrelated that their
prosecution entails proof of essentially the same facts.  Because we believe this is not a case of
such  interrelation, we hold that the
trial court=s allocation of fees
attributable to the prevailing claimCthe
redemption declaratory judgment claimCwas
proper.  We therefore conclude that
Cotten is entitled to those fees attributable to the prosecution of his
redemption declaratory judgment claim and, therefore, that the trial court was
correct in awarding this amount.

Because Cotten prevailed on his redemption
declaratory judgment claim and the trial court reduced the jury=s
attorney=s fees
award to reflect the amount shown by the evidence, we hold that the trial court
did not abuse its discretion by awarding Cotten attorney=s
fees.  We overrule WBI=s fifth
cross-issue.








Additionally, we find no evidence in the record
to indicate that the trial court=s denial
of an attorney=s fees award to WBI was
inequitable or unjust, and there is also some evidence to support the
denial.  At trial, Cotten prevailed in
his redemption declaratory judgment claim against WBI.  WBI was granted a directed verdict on Cotten=s
inspection claim, and, as set forth above, we held that the trial court erred
by granting that motion.  Furthermore,
the jury specifically awarded WBI no attorney=s
fees.  Therefore, we hold that the trial
court did not abuse its discretion by denying WBI attorney=s
fees.  We overrule WBI=s sixth
cross-issue.

Conclusion

We reverse the part of the trial court=s
judgment rendering judgment as a matter of law on and dismissing Cotten=s
inspection claim against WBI and his oppression and conspiracy claims against
Sharp and Statham.  We remand those three
claims for trial.

We modify the trial court=s
judgment to delete the finding that Cotten remained a preferred shareholder of
WBI through the date on which all outstanding preferred shares were redeemed,
January 7, 2002, and to insert the finding and order that Cotten remains a
preferred shareholder entitled to have and recover from WBI preferred dividends
until his shares are properly redeemed.  

We affirm the trial court=s
calculation of preferred dividends due Cotten from April 1, 1997 through
January 7, 2002, but we reverse and remand the case to the trial court for
calculation of additional preferred dividends due Cotten from January 8, 2002
to the date of the trial court=s
judgment and for recalculation of prejudgment interest in accordance with this
opinion.

 

 








We affirm the remainder of the trial court=s
judgment.

 

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL A:   CAYCE, C.J., DAUPHINOT, J., and JOHN T. BOYD,
J. (Retired, Sitting by Assignment).

 

CAYCE, C.J. concurs in
part and dissents in part without opinion. 
He would affirm the trial court=s judgment in its entirety.

 

DELIVERED:  February 9, 2006

 











[1]See Tex. Bus. Corp. Act. Ann. art. 2.44, ' C
(Vernon Supp. 2005).





[2]See Prudential Ins. Co.
v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000); Ray v. McFarland, 97 S.W.3d
728, 730 (Tex. App.CFort Worth 2003, no
pet.). 





[3]See City of Keller v.
Wilson,
168 S.W.3d 802, 827 (Tex. 2005).





[4]Coastal Transport Co. v.
Crown Cent. Petroleum Corp., 136 S.W.3d 227, 234 (Tex. 2004).





[5]Szczepanik v. First S.
Trust Co.,
883 S.W.2d 648, 649 (Tex. 1994).  





[6]Tex. Bus. Corp. Act. Ann. art. 2.44, ' C.





[7]Martin v. Martin, Martin, & Richards, Inc., 12 S.W.3d 120, 124
(Tex. App.CFort Worth 1999, no pet.).





[8]Black=s Law Dictionary 623 (8th ed. 2004).





[9]Id. at 591.





[10]Webster=s Ninth New Collegiate
Dictionary 440 (9th ed. 1983).





[11]See Fitzgerald v. Advanced Spine Fixation Sys., Inc., 996 S.W.2d 864, 865B66 (Tex.
1999) (stating that a court construes a statute Afirst, by looking to the plain and common meaning of
the statute=s words@).





[12]Grinnell v. Munson, 137 S.W.3d 706, 718 (Tex. App.CSan Antonio 2004, no pet.); In re Estate of Fawcett,
55 S.W.3d 214, 220 (Tex. App.CEastland 2001, pet. denied); Faour v. Faour,
789 S.W.2d 620, 622B23 (Tex. App.CTexarkana 1990, writ denied); see also Hoggett v.
Brown, 971 S.W.2d 472, 488 n.13 (Tex. App.CHouston [14th Dist.] 1997, pet. denied) (noting that Ain
certain limited circumstances, a majority shareholder who dominates control
over the business may owe such a duty to the minority shareholder@).





[13]Grinnell,
137 S.W.3d at 718.





[14]Hoggett, 971
S.W.2d at 488; see also Myer v. Cuevas, 119 S.W.3d 830, 836 (Tex. App.CSan
Antonio 2003, no pet.).





[15]Fawcett, 55
S.W.3d at 220.





[16]Hubbard v. Shankle, 138 S.W.3d 474, 483 (Tex. App.CFort Worth 2004, pet. denied).





[17]Hogget, 971
S.W.2d at 488.





[18]Id.





[19]Hubbard, 138
S.W.3d at 483.





[20]Hogget, 971
S.W.2d at 488.





[21]See DeBord v. Circle Y of Yoakum, Inc., 951 S.W.2d 127, 133 (Tex. App.CCorpus
Christi 1997), rev=d on other grounds, Stary v. DeBord, 967 S.W.2d 352 (Tex. 1998).





[22]Schlueter v. Carey, 112 S.W.3d 164, 169 (Tex. App.CFort Worth 2003, pet. denied)





[23]See id. at
169B70.





[24]Lawrence E. Michell, The Puzzling Paradox of
Preferred Stock (And Why We Should Care About It), 51 Bus. Law. 443, 445B50
(1996).





[25]See, e.g.,
Eisenberg v. Chicago Milwaukee Corp., 537 A.2d 1051, 1060B61 &
n.13 (Del. Ch. 1987); Rothschild Int=l Corp. v. Liggett Group Inc., 474 A.2d 133, 136 (Del. 1984); Judah v. Del.
Trust Co., 378 A.2d 624, 628 (Del. 1977).





[26]Prudential Ins. Co., 29 S.W.3d at 77; Ray,
97 S.W.3d at 730.





[27]Pinnacle Data Servs., Inc. v. Gillen, 104 S.W.3d 188, 196 (Tex. App.CTexarkana
2003, no pet.) (emphasis added); Willis v. Bydalek, 997 S.W.2d 798, 801
(Tex. App.CHouston [1st Dist.] 1999, pet. denied).





[28]Black=s Law Dictionary 1127.





[29]See Eric J.
Gouvin, Of Hungry Wolves And Horizontal Conflicts: Rethinking the
Justifications for Bank Holding Company Liability, 1999 U. Ill. L. Rev. 949, 989B90
(1999).





[30]See Michell,
note 25, at 450; Gouvin, note 30, at 989-90.





[31]See Gouvin,
note 30, at 989-90.





[32]Michell,
note 25, at 450; Gouvin, note 30, at 989-90.





[33]Gouvin, note
30, at 991.





[34]See Pinnacle Data Servs., 104 S.W.3d at 196; Willis, 997 S.W.2d at 801.





[35]See Prudential Ins. Co., 29 S.W.3d at 77; Ray, 97
S.W.3d at 730.





[36]Operation Rescue Nat=l
v. Planned Parenthood, 975 S.W.2d
546, 553 (Tex. 1998); Morris v. JTM Materials, Inc., 78 S.W.3d
28, 55 (Tex. App.CFort Worth 2002, no pet.).





[37]See Operation Rescue, 975 S.W.2d at 553; Morris,
78 S.W.3d at 55.





[38]See In re
Arthur Andersen, 121 S.W.3d 471, 482 (Tex. App.CHouston
[14th Dist.] 2003, orig. proceeding).





[39]Id.





[40]Pabich v. Kellar, 71 S.W.3d 500, 508 (Tex. App.CFort Worth 2002, 
pet. denied).





[41]Portlock v. Perry, 852 S.W.2d 578, 582 (Tex. App.CDallas 1993, writ denied).





[42]Kirby v. Cruce,
688 S.W.2d 161, 166 (Tex. App.CDallas 1985, writ ref=d n.r.e.) (quoting Kinzbach Tool Co. Inc. v.
Corbett-Wallace Corp., 160 S.W.2d 509, 514 (Tex. 1942)).





[43]Arthur Andersen,
121 S.W.3d at 481B82.





[44]Tex. R. Civ. P. 166a(i).





[45]Id.; Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 207 (Tex. 2002).





[46]See Tex. R. Civ. P. 166a(i) & cmt.; S.W.
Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002).





[47]King Ranch,
Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003), cert. denied, 124
S. Ct. 2097 (2004); Johnson, 73 S.W.3d at 197; Morgan v. Anthony,
27 S.W.3d 928, 929 (Tex. 2000).





[48]Moore v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.CSan
Antonio 1998, pet. denied).





[49]Flanary v. Mills, 150 S.W.3d 785, 795 (Tex. App.CAustin 2004, pet. denied).





[50]Id.





[51]Id.





[52]Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex.
2001); Hubbard, 138 S.W.3d at 482B83.





[53]Flanary, 150
S.W.3d at 795.





[54]Hubbard, 138
S.W.3d at 483; Fawcett, 55 S.W.3d at 218.





[55]18 Am. Jur. 2d Corporations
' 456 (2004); Hay v. Big Bend Land Co., 204 P.2d
488 (Wash. 1949);(citing Thompson v. Fairleigh, 187 S.W.2d 812 (Ky.
1945).





[56]Id.





[57]See Tex. R. App. P. 47.1.





[58]See Aetna Cas. & Sur. Co. v. Specia, 849 S.W.2d 805, 807 (Tex. 1993) (applying former
Rule 215(5)).





[59]Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040
(1999); Robert W. Calvert, "No Evidence" and
"Insufficient Evidence" Points of Error, 38 TEX. L. REV. 361, 362-63 (1960).





[60]City of Keller v. Wilson, 168 S.W.3d 802, 827
(Tex. 2005). 





[61]Cont=l Coffee Prods. Co. v.
Cazarez,
937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby, 935 S.W.2d 114, 118
(Tex. 1996).





[62]See Tex. Bus. Corp. Act Ann. art. 5.11B.12
(Vernon Supp. 2005).





[63]See Gunn Buick,
Inc. v. Rosano, 907 S.W.2d 628, 631 (Tex. App.CSan
Antonio 1995, no writ).





[64]Morgan v. Arnold, 441 S.W.2d 897, 903B04 (Tex. App.CDallas 1969, writ ref=d n.r.e.).





[65]See, e.g.,
Alma Invs., Inc. v. Bahia Mar Co-Owners Ass=n, 999 S.W.2d 820, 822 (Tex. App.CCorpus
Christi 1999, pet. denied); Harry Hines Med. Ctr., Ltd. v. Wilson,
656 S.W.2d 598, 602 (Tex. App.CDallas 1983, no writ). 





[66]See, e.g.,
Tex. R. Civ. P. 298; Alma
Invs., 999 S.W.2d at 822; Robles v. Robles, 965 S.W.2d 605, 611
(Tex. App.CHouston [1st Dist.] 1998, writ denied); Wilson,
656 S.W.2d at 602.





[67]Great Am. Ins. Co. v. North Austin Mun. Util. Dist.
No. 1, 908 S.W.2d 415, 426 (Tex.
1995); Taylor Foundry Co. v. Wichita Falls Grain Co., 51 S.W.3d 766, 774
(Tex. App.CFort Worth 2001, no pet.); Harris County v. Smoker,
934 S.W.2d 714, 721 (Tex. App.CHouston [1st Dist.] 1996, writ denied).





[68]Lester v. Logan,
893 S.W.2d 570, 577 (Tex. App.CCorpus Christi 1994), writ denied per curiam,
907 S.W.2d 452 (Tex. 1995); Rauscher Pierce Refsnes, Inc. v. Great S.W. Sav.
F.A., 923 S.W.2d 112, 117 (Tex. App.CHouston [14th Dist.] 1996, no writ).





[69]Tex. Civ. Prac. & Rem.
Code Ann. ' 37.009 (Vernon 1997).





[70]Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 1998).





[71]Id.





[72]Beard Family P=ship v. Commercial Indem., 116 S.W.3d 839, 850 (Tex. App.CAustin
2003, no pet.).





[73]Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 11 (Tex. 1991); Houston Livestock
Show & Rodeo, Inc. v. Hamrick, 125 S.W.3d 555, 585 (Tex. App.CAustin
2003, no pet.).





[74]Hamrick, 125
S.W.3d at 585.